State v. Darling.

---

## THE STATE v. SILAS DARLING, Appellant.

### Division Two, February 2, 1909.

1. **HOMICIDE: Conspiracy.** If several persons conspire to do an unlawful act and death results to the person against whom the conspiracy was formed, at the hands of one of them, all are alike guilty of the homicide.

2. ———: ———: **Aid.** He who advises or encourages another to do an illegal act is responsible for all the natural and probable consequences that may arise from its perpetration.

3. ———: ———: **To Whip Another: Manslaughter.** A defendant who entered into a conspiracy with his brother to whip and commit an assault upon deceased, and went along with his brother to aid him in that unlawful act, and was present when he assaulted deceased with an unlawful weapon and killed him, is a co-conspirator, though he may not have known his brother had the unlawful weapon and did not know that he had formed a design to kill deceased; and an instruction authorizing the jury to find defendant guilty of manslaughter in the fourth degree is not erroneous, but more liberal to him than he had a right to request.

4. **INFORMATION: Amendment: Without Verification.** An amendment to the information in a murder case, after it was filed and verified, by inserting in one place, with leave of court, the word "deliberately" and in another the word "wilfully," is allowable under the statute (Sec. 2481, R. S. 1899) authorizing an information to "be amended in matter of form or substance at any time by leave of court before trial;" and it was not necessary, after such amendment was made, that it be reverified. Where defendant was convicted of manslaughter only, the insertion of the word "deliberately" did not affect his rights.

Appeal from Cooper Circuit Court.—*Hon. Wm. H. Martin,* Judge.

AFFIRMED.

*C. D. Corum* for appellant.

The instruction is palpably erroneous. Under it, all that the jury had to find in order to convict defendant was that he understood that his brother intended "merely to whip said Jeffress," and that he went along to aid his brother in whipping Jeffress if it became necessary for him to lend his aid. This does not constitute manslaughter in the fourth degree, nor in any degree. If the jury had been called upon to determine that this defendant and his brother entertained a common intent to assault Jeffress, and that Jeffress was killed in the execution of such common plan, by Ernest Darling, without resort by him to the use of a deadly weapon, then probably the instruction would have embodied the elements of manslaughter. But there is another rule of law, which we also recognize, and which is equally well settled, namely: That if two or more persons combine together to commit an unlawful act, and the common design does not contemplate the commission of a homicide, and is of such a nature that a homicide will not be the natural or probable result thereof, then participation in that design is not sufficient to make one liable for the homicide committed concurrently with the execution of the common plan by the fresh and independent act of one of the conspirators acting outside of and foreign to the common design. (1) Defendant did not assault Jeffress, attempt to assault him, or encourage his brother to assault him; and unless Ernest Darling killed the deceased in the attempt to execute a purpose common to both, then defendant in no event can be guilty of anything, and the question of common design must be left to the jury. White v. People, 139 Ill. 149; Cortez v. State, 66 S. W. 459; Omer v. Commonwealth, 25 S. W. 594; Cecil v. State, 72 S. W. 197; Easterlin v. State, 43 Fla. 565; State v. Ferney, 21 Pac. 213. (2) The court committed error in declaring, as a matter of law, that

defendant was liable for the independent act of his brother in assaulting the deceased with a deadly weapon and that such act was the natural and probable outcome of an attempt "merely to whip the said Jeffress." This also was a question for the jury. McElroy v. State, 120 Ala. 285; Frank v. State, 27 Ala. 43; Bowers v. State, 7 S. W. 246; Powers v. Commonwealth, 67 S. W. 735; State v. Ferney, 21 Pac. 213; Lusk v. State, 2 So. 257. (3) Instruction 8, given by the court, is as bad as the instruction which we have just discussed. Indeed, it is worse. It permits the jury to convict defendant of a felony notwithstanding the principal may have had no felonious intent, and permits the jury to find defendant guilty, regardless of whether Jeffress was killed or not. It, like the other manslaughter instruction, stands out in bold relief and does not refer the jury to any other instruction in the case. Under instruction 7 the jury were authorized to convict defendant if Ernest Darling had a felonious intent. Under instruction 8 the jury were authorized to convict the defendant if Ernest Darling had no felonious intent. And under either instruction the jury were authorized to convict this defendant of a felony even though he had no felonious intent, and without requiring the jury to find that he had committed any act or acts which would justify the inference of felonious intent as a matter of law.

*Herbert S. Hadley,* Attorney-General, and *F. G. Ferris,* Assistant Attorney-General, for the State.

(1) The court committed no error in the giving of instructions. Those given fully and fairly covered all the questions of law arising in the case, which were necessary for the information of the jury in giving their verdict. State v. Ernest Darling, 199 Mo. 168; State v. Silas Darling, 202 Mo. 150; State v. Bobbitt, 215 Mo. 10. (2) The instructions in reference to defendant's being present at the time Jeffress was

killed for the purpose and with the intention of aiding and abetting his brother, Ernest, correctly declared the law. 1 McClain on Criminal Law, secs. 204, 205; Wharton on Homicide, sec. 418; 4 Elliott on Evidence, sec. 2781; State v. Walker, 98 Mo. 95, 110. (3) The court did not err in giving instructions 7 and 8 on manslaughter in the fourth degree. State v. Ernest Darling, 199 Mo. 197; State v. Silas Darling, 202 Mo. 170. (4) Instruction 11, in respect to a conspiracy and the statements and acts of the conspirators, was properly given. State v. Ross, 29 Mo. 32; State v. Ernest Darling, 199 Mo. 199; State v. Bobbitt, 215 Mo. 10; 4 Elliott on Evidence, secs. 2941-3.

GANTT, P. J.—This is the second appeal in this cause. The former appeal was decided at the October term, 1906, of this court, and reported in 202 Mo. 150. That appeal resulted in reversing the judgment and remanding the cause for a new trial.

At the October term, 1907, the defendant was again put upon his trial and convicted of manslaughter in the fourth degree, and his punishment assessed at imprisonment in the county jail for a period of twelve months, and from that sentence and judgment he has again appealed to this court.

The full statement of all the material facts will be found in the opinion of Judge BURGESS on the former appeal. Much of the testimony, however, elicited on the first trial was eliminated on the last trial, and it will only be necessary to state for the understanding of the questions presented on this appeal the salient and controlling facts.

On the 13th day of March, 1905, Samuel Jeffress was killed at the county of Cooper by Ernest Darling on the farm of Charles Carroll for whom he was working on that day. At the time of his death he was at work plowing in the field of Mr. Carroll.

The evidence discloses that in the month of Dec-

ember, 1904, or January, 1905, Ernest Darling had a fight with one Cramer near the town of Blackwater, in said county. It seems that Cramer was a friend of the deceased Jeffress, and as Cramer had been quite badly beaten in his fistic encounter with Ernest Darling, Jeffress, the deceased, espoused the cause of Cramer and hot words passed between Ernest Darling and the deceased. The evidence tended to show that the deceased was about eighteen years of age and resided with his mother at the village of Nelson in Saline county near the Cooper County line. On the 11th of March, 1905, he left his home to work for Mr. Carroll in Cooper county. On the next day, which was Sunday, Emmett Yeager went to the Darling home, where he found the defendant Silas Darling, his brother Ernest and Dorval Burris. Yeager told Ernest Darling that the deceased was going to work at Mr. Carroll's the next day. Ernest replied "that will be all right." Ernest Darling then said to Dorval Burris, "Sam Jeffress is going to work out here at Charles Carroll's to-day." Burris replied, "Is he?" and Ernest said, "Yes, and I will get the s— of b—— to-morrow." Burris then said, "I would like to slip along and see it done. I have got to plow your mother's garden in the morning, but if you will wait until to-morrow afternoon, I will go." After this the defendant Silas Darling joined Ernest and Burris and Ernest said to defendant, Silas, "Sam Jeffress is going to work out here at Charles Carroll's," and defendant said, "Is he?" and turned and left the room, but before going Ernest said to him that he would get him, Jeffress. Burris told Silas, the defendant, that Ernest said he ought to go down to-morrow, and defendant said, "Yes, I believe you ought." That same afternoon Emmett Yeager and Ernest Darling were at the Finley home together. Ernest asked Millie Finley if she knew Sam Jeffress, adding, "He is a pretty good looking boy," to which she replied,

"Yes," and Ernest said, "Probably he won't look as well to-morrow as he does today." On the way home that night Ernest said to Yeager, "I told Sam while he was cussing me on the street at Blackwater I would get my revenge, and, by God, I will get it, too." On the same Sunday, Burris was riding behind Silas on a horse on the way home from Speece's when Silas, the defendant, said to him, "I had better go down with Ern to-morrow, Sam might come the knife play," referring to the deceased. After dinner the next day, as the defendant started out of the house he said to Burris that he was going over to Carroll's, to which Burris replied, "No, we will go up and chop cord wood," and then they went towards the barn, where they said they would go and settle upon what they were going to do. While at the barn Ernest, Silas and Burris discussed the subject of going over to Carroll's to whip the deceased. Burris said to Ernest, "Ern, you ought not to go down there, but catch him on the road," to which Ernest replied, "If I don't go over there now, G— d—, if I don't go now, I won't ever get him."

They started from the barn, Ernest and Silas, the defendant going around on the north side of the house where there was a pile of scrap iron, and Burris passing through the house to get a drink of water. The three then went on towards Carroll's place. As they came along the road, Ernest said it would be a joke if deceased had gone to town. They met Charles Pyatt on the road and said to him that they were duck-hunting. As they approached the Carroll house, it was agreed that the defendant should do the talking, and he asked to borrow a lister from Mr. Carroll. At the Carroll house, the defendant asked Mrs. Carroll where Mr. Carroll was and being informed by her that he had gone to town, he said, "Well, we will go on down towards the Lamine river and we will meet him." They

left the house talking about the deceased for some distance, and then sent Burris back for the purpose of learning whether the deceased was about the place. When he came back and joined Ernest and the defendant, they saw the deceased at work in the field and went across the field towards him. As they approached him they found him with his team stopped, leaning against one of the handles of the tongueless cultivator, which he was working. He was wearing a pair of gloves, one of which he removed in taking a chew of tobacco. He had in his pocket a small monkey-wrench for use with the cultivator. Burris and the defendant approached the deceased directly in front and engaged him in conversation while Ernest passed around to the rear of the deceased, and without a word passing between the deceased and Ernest and without any unpleasant or unusual conversation between the deceased and the defendant and Burris or any hostile movement on the part of the deceased, Ernest Darling hit deceased on the side and back of the head with what appeared to be a piece of iron and the blow felled him to the ground at the cultivator handles. Ernest quickly followed the first lick with blows upon the head of the deceased with this iron, saying as he did so, "You remember how you done me down at Blackwater, I will get even with you." He asked the deceased to hollow "Enough," which deceased did. The head of the deceased was beaten down into the ground and he was mangled and bleeding profusely when Burris lifted him, but he was too weak to stand. Thereupon the defendant, Silas, said, "I know what we will do. We will turn the team loose," and said they would make people think the team had injured the deceased. About this time Bill Spry, passing in the distance, was called to the scene by Burris, and to him Ernest said, referring to the deceased, "He called me a son of a b——, and I knocked him over the plow handles with the lines over his shoulders." Spry said, "The

boy is bleeding a right smart." And Ernest said, "Yes, and let him bleed, d— him, it is good enough for him." The deceased was taken to the home of Mr. Carroll by the defendant, his brother and Burris, and died just as he reached the house. The defendant declined to help the deceased into the wagon, or to take him out when they reached the house, saying that he did not want to get blood on his hands.

Witnesses for the State who visited the scene of the tragedy the next morning testified that the earth where the deceased fell bore the impression of his head and the stains of pools of blood. No rocks or other objects which could have been used as weapons were found near the scene, but witnesses for the defendant testified that several days after the killing they found several rocks at this immediate point with blood upon them. After the homicide, Ernest said to Burris in the presence of the defendant, "You must swear that he called me a son of a b—— and started at me with a monkey-wrench, and that you put it back in his pocket." After the preliminary trial, the defendant told Burris that he must keep his mouth shut and not tell anything. And defendant said that he did not know what to do or think about that monkey-wrench. While in the jail together they had frequent conversations as to what their testimony would be. The coroner testified that he found the monkey-wrench which had remained in Jeffress's pocket while Ernest was beating him.

The evidence on the part of the defendant tended to prove threats of the deceased against Ernest Darling. These treats were not communicated, however, to Ernest. There was also evidence impeaching witness Spry. The defendant testified in his own behalf that if his brother Ernest Darling, on the occasion of going to the field, had upon or about his person a piece of iron, he, defendant, was not aware of it. Burris tes-

tified that he was surprised when Ernest struck the deceased with a piece of iron.

I. The principal ground upon which the defendant seeks a reversal of the judgment is the giving of the following instruction by the court over the objection of the defendant:

"If you believe from the evidence that prior to the killing of Samuel Jeffress, Ernest Darling had formed a design to kill said Jeffress, or to inflict upon him some bodily harm, and he, Ernest Darling, armed himself with a deadly weapon and sought the said Jeffress and assaulted him with felonious intent of killing him or doing him great bodily harm, and that the said Ernest Darling did assault and kill said Samuel Jeffress; yet if you further believe from the evidence that the defendant, Silas Darling, went with his brother Ernest Darling to the scene of the killing for the purpose of and with the intention, if necessary, to aid, encourage, or to abet his brother, Ernest Darling, in assaulting said Jeffress, but that the defendant did not know that his brother Ernest Darling intended to use a deadly weapon in making such assault, and did not know of a felonious intent on the part of Ernest Darling, but understood at the time that it was the purpose and intention of his brother Ernest Darling, merely to whip the said Jeffress, then and in that event the defendant cannot be guilty of any higher crime than manslaughter in the fourth degree."

It is insisted by the learned counsel for the defendant that this instruction authorizes the jury to find the defendant guilty of manslaughter in the fourth degree, notwithstanding he only entered into the conspiracy with his brother Ernest Darling with the intention merely of assisting Ernest Darling to assault and whip him and not to kill him. "If," they say, "the jury had been called upon to determine that the defendant and his brother entertained a common intent

to assault the deceased Jeffress, and that Jeffress was killed in the execution of such common plan by Ernest Darling without resort by him to the use of a deadly weapon, then probably the instruction would have embodied the elements of manslaughter, but to say that a person intending to aid another in making a simple assault on a third party, who does not know that the party whom he intends to aid has a felonious intent against said party and does not know that his associate has or intends to use a deadly weapon, is guilty of manslaughter when the person he is aiding resorts to the use of a deadly weapon and takes the life of such third person, therewith, is a monstrous proposition.''

If several persons conspire to do an unlawful act and death happens in the prosecution of the common object, all are alike guilty of the homicide. The act of one of them done in furtherance of the original design is in the construction of law the act of all. And he who advises or encourages another to do an illegal act is responsible for all the natural and probable consequences that may arise from its perpetration. [2 Hawk. P. C., ch. 29; 1 Hale P. C., ch. 34; 1 Russell on Crimes, 24; 1 Chitty, Criminal Law, 264.]

As to this familiar statement of the law we understand the learned counsel consent. In its 8th instruction the court advised the jury as to what would constitute a conspiracy between the defendant and Ernest Darling, in these words: ''That if the defendant, Silas Darling, with the knowledge of the intention of his brother Ernest to so whip Samuel Jeffress, accompanied his brother Ernest Darling to the scene of the tragedy for the purpose and with the intention of aiding, encouraging or assisting his brother Ernest if necessary in making such assault and was then and there present at the time of such assault for the purpose and with the intention of aiding, encouraging and abetting his brother Ernest Darling therein if necessary then the de-

fendant was guilty of manslaughter," if as required in the other instructions, Ernest Darling did kill the deceased in pursuance of that understanding.

In 1 McClain on Criminal Law, section 196, the author says: "It results from the principle stated in the preceding section that everyone connected with carrying out a common design to commit a criminal act is concluded and bound by the act of any member of the combination perpetrated in the transaction of the common design. But it is not necessary that the crime committed shall have been originally intended. Each is accountable for all the acts of the others done in carrying out the common purpose, whether such acts were originally contemplated or not, if they were the natural and approximate results of carrying out such purpose; and the question whether the result is the natural and probable effect of the wrongful act intended is for the jury. Thus, if several persons agree to commit and enter upon the commission of a crime involving danger to human life, such as robbery, or assault and battery, or resisting an officer, or resisting arrest, all are criminally accountable for death caused in the common enterprise. Thus, also, if the unlawful enterprise is likely to meet violent resistance, all will be liable for a felonious assault committed by one of their number in consequence of such resistance; and if the common design in general involves acts of violence, all who participate in the common plan are equally answerable for acts of others done in pursuance thereof, although the result was not specially intended by them all."

In 1 Wharton's Criminal Law (8 Ed.), section 220, it is said: "It is not necessary that the crime should be part of the original design; it is enough if it is one of the incidental probable consequences of the execution of that design, and should appear at the moment to one of the participants to be expedient for the common purpose. Thus where A and B go out for

the purpose of robbing C, and A, in pursuance of the plan, and in execution of the robbery, kills C, B is guilty of murder."

The doctrine on this particular subject is nowhere better reviewed and announced than in Williams v. State, 81 Ala. 1. In that case the court had occasion to consider the statement of Mr. Bishop in 1 Bishop's Criminal Law (7 Ed.), 637, in which the learned author says: "If two combine to fight a third with *fists*, and death accidentally results from a blow inflicted by one, the other also is responsible for the homicide. But if one resorts to a *deadly weapon* without the other's knowledge or consent, he only is thus liable." It is this exception to the general rule upon which counsel for the defendant insists that the instruction given by the court in this case was erroneous and he cites this statement of the law by Bishop and the case of Reg. v. Caton, 12 Cox, C. C. 624, in support of the proposition. Speaking of this limitation of the rule by Bishop, the Supreme Court of Alabama says: "The implied agreement here is evidently not to resort to the use of a deadly weapon, and the use of such weapon is therefore foreign to the contemplation of the parties, and a departure from the common design. It is said by some of the standard authors that if the specific act agreed to be done was *malum in se,* the responsibility for unintended results would embrace acts arising from misfortune or chance; but otherwise if such specific act was *malum prohibitum* merely, or lawful. [1 Bishop Cr. Law (7 Ed.), sec. 331.] In some cases the distinction is taken that where persons unlawfully conspire to commit a trespass only, to make all the confederates guilty of murder, the death must ensue in the prosecution of the design. If the unlawful act be a felony, or be more than a trespass, it will be murder in all, 'although the death happened collaterally, or beside the original design.' [State v. Shelledy, 8 Clarke (Iowa) 477.] In another recent case the rule

was announced that 'if the unlawful act agreed to be
done is dangerous, or homicidal in its character, or
if its accomplishment will necessarily or probably re-
quire the use of force and violence, which may result
in the taking of life unlawfully, every party to such
agreement will be held criminally liable for whatever
any of his co-conspirators may do in furtherance of
the common design, whether he is present or not.'
[Lamb v. People, 96 Ill. 73.] The question in
this case then would seem to me, whether if
five or six men combine together to invade
a man's household, and they go there armed with dead-
ly weapons for the purpose of attacking and beating
him, and in furtherance of this common design, all
of the confederates being present, or near at hand, one
of them gets into a difficulty with their common ad-
versary and kills him, all may not be guilty of murder,
although they did not all entertain a purpose to kill?
The question, we think, must be answered in the affirm-
ative, in the light of both principle and authority.
Every man has the right to defend his house against
every unlawful invasion, and to defend his person,
when within it, against every and all violence, with-
out the necessity of retreat. The experience of man-
kind shows that very few men will fail to respond to
instinct by exercising this right, to the extent even of
killing an assailant if necessary. When a mob, con-
spiring together unlawfully, go to a man's house to do
any serious violence to his person, especially in the
nighttime, as here, they can expect nothing else than
to meet with armed opposition, and the inference is not
unreasonable that they intend nothing less than to
oppose force to force, in the furtherance of their de-
sign. The natural and probable consequence of this
is homicide—either of one or more of the assailants
or of the party thus assailed, and such homicide, when
committed by any one of the conspirators, can be
nothing less than murder in all who combine to com-

mit the unlawful act of violence, especially if they be near at hand inciting, procuring, or encouraging the furtherance of the act of assault and battery.''

In Peden v. State, 61 Miss. 267, several persons conspired together to take one Walker from his house and whip him. He was accordingly taken from his bed and severely beaten, and in executing this design, one of the confederates struck him a fatal blow with a spade from which he died. It was held that all were guilty of murder whether they entertained a purpose to kill Walker or not. [See, also, Brennan v. People, 15 Ill. 511.]

That the evidence in this case fully justified the instruction of the court submitting to the jury the defendant's knowledge and intention of the intended assault and determination on the part of his brother Ernest to whip the deceased, and whether he had gone with him to aid, assist and abet in the assault and battery, there can be no doubt whatever. That such an assault and battery is what the text-writers denominate *malum in se* is also plain. It is to be observed that in this case the method and means by which Ernest was to make this assault were not limited as in the case stated by Mr. Bishop where they agreed to fight with *fists* only, and one used a deadly weapon without the knowledge of his confederate, but the evidence showed a conspiracy to assault and whip the deceased without any such limitation. As said by the Alabama Supreme Court, the defendant, knowing of this purpose and going along to assist in it, could expect nothing else than that the deceased would naturally oppose force to such unlawful design upon his person, as the experience of mankind shows that very few men would tamely submit to such an outrage and indignity, and a natural and probable consequence to such an encounter would be homicide, either of the deceased, or of one of them. And the law will hold him responsible for the act of his brother. Most of the adjudicated

cases hold that he would be guilty of murder in such
a case, and he has no cause to complain that the court
limited his offense to manslaughter in the fourth de-
gree. We do not think that the court in this instruc-
tion lost sight of the question of common design as
between Ernest Darling and the defendant. On the
contrary, the liability of the defendant throughout
the case was predicated upon the fact of his having
entered into the unlawful design to assault and whip
the deceased. Neither do we think this is a case fall-
ing within the principle that where one of the con-
spirators goes outside of the common plan and com-
mits a fresh and independent act wholly outside and
foreign to the common design, the others are not to
be held equally guilty of that act.

Taken altogether, we think this instruction was ex-
ceedingly favorable to the defendant and the court did
not err in giving it. It follows from what we have
already said that in our opinion the court committed
no error in refusing to direct the jury to acquit the
defendant.

II. After the information was filed and verified,
by leave of the court, the prosecuting attorney amend-
ed the same by inserting in one place the word "de-
liberately" and in another "willfully," but did not re-
verify the information after the amendment. Defend-
ant moved to quash on the ground that the information
was not verified. Section 2481, Revised Statutes 1899,
provides that "any affidavit or information may be
amended in matter of form or substance at any time
by leave of court *before the trial,* and on the trial
as to all matters of form and variance, at the discre-
tion of the court, when the same can be done without
prejudice to the substantial rights of the defendant,
on the merits," etc. This statutory provision was
ample authority for the action of the court and prose-
cuting attorney. When the prosecuting attorney added

the two words over his own signature and affidavit, he amended the information, and there was no need of a new affidavit, which was no part of the information. Clearly the insertion of the word "deliberately" did not affect defendant's rights as he was found guilty of manslaughter only.

Counsel concede that an information need not be reverified where unimportant amendments are made. We think the statute is a wise and salutary one and should not receive a harsh construction. A broad distinction exists between allowing the amendment of an indictment, as it is the act of a grand jury, and an information by a prosecuting attorney, made by leave of court. The latter may very properly be made by the officer who prefers it and when he does amend it, there is no occasion for reverifying it.

III. The complaint as to the remarks of the prosecuting attorney and the action of the court thereon, afford no ground for reversal. It is conceded that the language of the prosecuting attorney was not taken in his exact words and the trial court who heard the argument overruled the point and we think the whole colloquy taken together fails to show any prejudice. The result shows that the jury were not influenced to find defendant guilty of murder in either degree. The judgment is affirmed. All of this division concur.