# THE STATE v. JAMES A. PLOTNER, Appellant.

### Division Two, June 4, 1920.

1. **FALSE ENTRIES: Bank Account: Statute: Necessary Elements: Information.** To sustain a conviction under Section 4653, Revised Statutes 1909, five elements of the crime must be charged and proven: (a) an intent to defraud; (b) a false entry in a book of accounts kept by a corporation, by which (c) some pecuniary obligation or credit shall purport to be increased, diminished or discharged, or in some manner affected; (d) the book must be delivered, or must be intended to be delivered, (e) to some person dealing with the corporation. In this case the first three elements were properly alleged and established by sufficient proof; but the information does not allege that the bank delivered, or intended to deliver, the book to any person, or kept it for that purpose, and therefore the judgment is reversed.

2. ———: **Delivery of Account Book.** A delivery of the book of accounts to the officers of the bank, or the examining committee of its directors, does not constitute the delivery required by Section 4653, Revised Statutes 1909, for it requires that the book must be delivered, or intended to be delivered, to some person "dealing with such corporation," and the directors or other officers of the bank, acting for it, do not come within the designation; but a clearance house auditor, state bank examiner, or any stockholder or depositor is a "person dealing with the corporation" within the meaning of the statute.

3. ———: ———: **Inspection.** A mere inspection or looking at a book of accounts kept by the bank is not a delivery of the book. To constitute delivery there must be at least a temporary change of control or possession.

4. ———: ———: **Intention.** The intention of a defendant, charged with making false entries in a bank book, or with causing such false entries to be made, in delivering said book, is immaterial. The words of the statute describing the book of accounts as one "delivered or intended to be delivered to any person dealing with the corporation," refer to the intention of the corporation which owns the book—the purpose for which the book is kept.

5. ———: ———: **Intention to Defraud.** The intention of the person making or causing to be made the false entries in the bank book must be to defraud, but it matters not against whom the intention would operate.

6. ———: Conspiracy: General Purpose or Scheme. What one conspirator does in carrying out the general purpose to defraud is the act of the other, even though they differ in unimportant details as to how the scheme shall be carried through. So that, where defendant instructed the bookkeeper of a bank to charge his checks to some depositor whose account would stand it, and in pursuance of that general purpose to defraud, the bookkeeper charged defendant's checks to different persons through successive days, among others to Toller, but was told by defendant not to charge the particular check mentioned in the information to Toller, but did so, nevertheless, because, upon inspection he thought Toller's account would "stand it," the crime against defendant is proven, the general purpose of the conspiracy being to obtain money by making false entries and concealing the acts.

7. ———: ———: Other Crimes. Evidence that numerous other checks drawn by defendant were charged to other depositors in the bank, in pursuance to the general purpose of the conspiracy to defraud by false entries, is competent for the purpose of showing the intent with which the particular false entry was made.

8. LIMITATIONS: Information Within Three Years: Amendment. Where an information charging false entries made in a bank book was filed four days before the three years after the crime was committed had expired, and later the State was by order of court given leave to file an amended petition and did so, the case is not barred by limitations.

9. FALSE ENTRIES: Applies to One Entry. The words "false entries" used in the statute applies to one entry, under the statute (Sec. 8053, R. S. 1909) which says that the plural number includes the singular.

Appeal from Jackson Circuit Court.—*Hon. E. E. Porterfield*, Judge.

REVERSED AND REMANDED.

*Stubbs & Stubbs* and *E. W. Sloan* for appellant.

(1) If the making of the entry set out in the information was a crime, it was not defendant's crime, but Kornfeldt's, for all the evidence is that the entry was made in direct violation of defendant's instructions. Bishop New Criminal Law (8 Ed.), sec. 637 and note; 1 Wharton on Criminal Law, sec. 647; State v. Lucas, 55 Iowa, 321; Watts v. State, 5 W. Va. 532; State v.

May, 142 Mo. 152. (2) There was 'no intent to defraud. The entry was not made for such purpose, did not carry out, nor aid in effectuating such purpose, but was for the purpose of making the books of the bank balance and tally; this for the purpose of preventing an investigation as to the manner in which the $200 loss had been sustained. (3) The book in which the entry was made was not delivered, nor intended to be delivered to any person dealing with the bank. (4) No pecuniary obligation, claim or credit was created, increased, diminished or discharged, or in any manner affected by the alleged false entry. (5) The information does not state facts sufficient to constitute the offense undertaken to be charged, nor any offense whatsoever. (6) The court erred in admitting evidence of other transactions offered by the State for the purpose of establishing that the defendant committed other crimes. State v. Hyde, 234 Mo. 250; State v. Goetz, 34 Mo. 85; State v. Harrold, 38 Mo. 496; State v. Young, 119 Mo. 495; State v. Crosswhite, 130 Mo. 358; State v. Turner, 76 Mo. 350. Evidence of other crimes is admissible only when tending to prove the one under investigation. State v. Jones, 171 Mo. 401; State v. Spaugh, 200 Mo. 571. (7) Even if the facts proved had constituted a violation of the statute in question, the offense was barred by the Statute of Limitations. The statute was not tolled by the first information. State v. English, 2 Mo. 147; State v. Duclos, 35 Mo. 237. Oral evidence will not be received to impeach the verity of a solemn record. Gibson v. Chateau, 45 Mo. 171; Priest v. McMaster, 52 Mo. 60; State ex rel. v. Prim, Judge, 61 Mo. 170. (8) The statute cannot be violated by a single entry. The statute as originally passed, used the word "entry" in the singular. R. S. 1840, p. 187, sec. 18. In 1845 the word "entry was changed to "entries." R. S. 1845, sec. 18, p. 372. At the time the statute was amended sections now numbered 8053 and 8055 were in force and effect and said amendment must be deemed to have been made in contemplation of said rules of construction, namely: That while in any statute words importing the

plural number shall apply to any matter in the singular, yet such shall not be the construction where there is "something in the subject or context repugnant to such construction." R. S. 1909, secs. 8053, 8055.

WHITE, C.—The defendant was convicted in the Circuit Court of Jackson County, of forgery in the third degree, in violation of Section 4653, Revised Statutes 1909, and appealed. The amended information on which he was tried (caption and signatures omitted) is as follows:

"Now comes Hunt C. Moore, prosecuting attorney for the State of Missouri, in and for the body of the County of Jackson, and upon his oath informs the court that John Edward Kornfeldt and James A. Plotner, whose Christian names in full are unknown to said prosecuting attorney, late of the county aforesaid, on the 14th day of September, 1914, at the County of Jackson, State of Missouri, did unlawfully and feloniously, conspire, combine and confederate with one another and together, with the felonious intent then and there to defraud the Mercantile Bank of Kansas City, Missouri, a moneyed corporation (existing under the laws of Missouri and engaged in the general banking business in the city of Kansas City, Jackson County, Missouri), and customers, depositors and patrons of said bank and corporation aforesaid, particularly one William H. Toller, of the money and personal property of said bank, aforesaid, and its said customers, depositors and patrons, particularly said Toller, and in pursuance of and to effectuate their said unlawful and felonious intent and purpose, did then and there unlawfully and feloniously cause to be made. and did make, a certain false entry and entries, in a certain book of accounts, then and there kept by said bank. aforesaid, in which said book of accounts was then and there recorded and kept the accounts of said bank. aforesaid. with its customers, depositors and patrons, and particularly the account of the said William H. Toller, its customer, depositor and patron, as aforesaid, thus and

thereby, unlawfully and feloniously by then and there making and entering the figures '200;' did then and there add and enter a charge of two hundred dollars ($200) against said Toller, depositor of said bank, as aforesaid, on said book of accounts, and then and there, and thus and thereby unlawfully and feloniously did diminish and discharge the existing pecuniary obligation of said bank, aforesaid, to said Toller in the sum and to the amount of two hundred dollars ($200), and at the same time and by the same act with the same unlawful and felonious intent and purpose, did then and there in manner and form as aforesaid, create a, as well as increase the, existing pecuniary obligation of said Toller to said bank, aforesaid, in the sum of and to the amount of two hundred dollars ($200); which said book of accounts with the said false and fraudulent entry and entries therein unlawfully and feloniously made as aforesaid, the said defendants, John Edward Kornfeldt and James A. Plotner, did unlawfully and feloniously intend to, and did deliver, to the officers of said bank, to-wit, George H. Ruddy, George M. Edwards, directors and officers of said bank, and William T. Kemper and others, persons then and there dealing with said bank, aforesaid, and to the said William H. Toller, depositor of said bank aforesaid.

"Against the peace and dignity of the State."

On a severance the trial proceeded against Plotner. John Edward Kornfeldt at the time of the trial had pleaded guilty, was under sentence to serve two years in the penitentiary and at liberty on parole. He was the principal witness for the State.

The defendant, in August, 1914, and thereafter, was an attorney with an office in the Lathrop Building, Kansas City, Missouri, and a depositor in the Mercantile Bank mentioned in the information. At that time Kornfeldt, a young man twenty-two years of age and unmarried, was a bookkeeper in the bank and had charge of those books representing the alphabet from K to Z, covering Plotner's account. Plotner had done Kornfeldt some favors so as to arouse a feeling of obligation

on Kornfeldt's part. About August 17, 1914, Plotner requested Kornfeldt to come to his office, which Kornfeldt did. Plotner then told Kornfeldt that he was expecting certain checks to come through the bank which he would not have money deposited to cover. He had a check for $200 coming through that day, and asked Kornfeldt to "take care of it." Kornfeldt was unable to see how he could take care of it in the absence of sufficient deposit to Plotner's credit. Plotner suggested that it could be handled by charging the amount to some other depositor who had ample deposit, and promised that he would make it good the following day. The check was according'1- presented, drawn by James A. Plotner, payable to B. Himberg. Kornfeldt carried out the scheme by charging the amount, $200, on the cash journal, to the account of William Toller, a depositor. No windfall came to Plotner that night or afterwards, and the amount still remained charged to the account of William Toller. Instead of having resources by which to make good the shortage, Plotner, apparently, was incurring continual drafts upon his resources, and a few days later drew another check for one hundred dollars, and Kornfeldt carried out the same sort of a scheme to cover up the transaction. Kornfeldt seemed to be completely under the influence of Plotner and ready to do anything the latter requested in the direction indicated, although he hoped and expected all the time, he said, that Plotner soon would make his shortages good. He endeavored at times to get Plotner to straighten out the trouble and was put off with promises and plausible explanations. Plotner's chronic need of money caused a repetition of the transaction mentioned through a period of about three months, until his total peculations amounted to $9,800. Among the checks so drawn and paid was one for $200 dated September 11, 1914, drawn by Plotner, payable to Hoff, Meservey, German & Michael, which was charged to the account of William Toller September 14, 1914. This was the check and the false entry described in the information.

About the middle of January, 1915, the Mercantile Bank was merged with the Commerce Trust Company of Kansas City, and when negotitations looking to that merger began, and some time prior to the merger, Kornfeldt told Plotner about it and Plotner began to figure some way to escape the inevitable discovery which would follow an examination of the Mercantile Bank's books. He suggested several methods to bluff the matter through and finally advised Kornfeldt to go to Kansas until he, Plotner, could fix it up, and Kornfeldt went. Plotner then, acting, he said, as attorney for Kornfeldt, went to the officers of the Mercantile Bank and told them Kornfeldt had been embezzeling funds on the bank and had confessed the same to him in his capacity as counsel; he suggested that a settlement in some way should be arranged. Before any definite conclusion of that matter, Kornfeldt returned from Kansas, was arrested and gave all the facts to the police officers. Finally Plotner substantially admitted his guilt; that he had got practically all the money he was charged with getting, by means of checks which he drew on his own account and which were charged by Kornsfeldt to the accounts of others. It turned out that the $200 check, the entry in regard to which constituted the offense for which the defendant was convicted, was drawn to pay a claim against Plotner, a claim which he owed for an account he had collected for some person.

The entry under consideration was made in the "Cash Journal" of the bank. It never appeared on Toller's pass book, but the entry on the cash journal affected Toller's account in that it reduced his deposit account two hundred dollars and thus reduced the obligation of the bank to him that much. It is not shown that this false entry relating to the $200 appeared on any other book kept by the bank.

The purpose for which the "Cash Journal" containing the false entry was kept, the use to which it was put, and what was done with it, were explained by several witnesses for the State. Kornfeldt testified that after

the entry was made in the book it was intended to be delivered to "anyone coming in who wished to look at it."
He did actually deliver the book to the board of directors of the bank; and to the committee appointed by the bank as the auditing committee to check up the book. "They came and asked me for it and I took it to them. That is a delivery as nearly as I can figure it out. I carried it into the directors' room and laid it down on the table."
He then said if William H. Toller had come in there and inquired for the book it was there for the purpose of delivery to him. This was for the purpose of inspection in the bank. Kornfeldt testified further that at the time of the merger of the Mercantile Bank and the Trust Company, before the delivery of the books of the bank to the Trust Company, he worked one whole day on Plotner's pass book in order to balance it up and deliver it to him. He didn't say that any false entries were in that pass book, and it may be inferred from his testimony that he was working to get entries in it that ought to have been there at the time of the transactions mentioned.

George H. Ruddy, who was cashier of the Mercantile Bank at the time of the transactions mentioned, swore that the cash journal in which the false entries appeared was under the control of Kornfeldt, whose duty as a bookkeeper was to take charge of it and to deliver it "to me or any other officer of the bank or any of our directors or to our examining committee as provided by the statute, or the clearing house examiner, or any customer who desired to examine his account in good faith, or any stockholder who wished to make an examination."

He testified further that in the transfer of the stock of the Mercantile Bank to the Commerce Trust Company the dealing was with one W. T. Kemper, and that the books of the bank, including the cash journal, were delivered to W. T. Kemper at the time of the transfer. The witness then explained that during all the time from the entry to the transfer to the Trust Company the books, including the cash journal, were there "for the *inspection* of people dealing with that bank. He then enumerated

the people who might inspect the book: ''The officers of the bank; the stockholders of the Mercantile Bank; the auditing committee appointed by the directors of the Mercantile Bank; the Clearing House auditor; the State Bank examiner, whenever he chose to make an examination; any depositor that desired to examine his particular account or any stockholder, and at this particular time, January 13, on account of this merger of the two institutions, Mr. Kemper, president of the Commerce Trust Company, or his representative.''

Kornfeldt on being asked if any of the officers of the bank requested him to bring the book, containing the false entry, to the Commerce Trust Company while the negotiation was pending, answered, ''Yes.'' On being asked whether or not he delivered the cash journal, containing the false entries, to any members of the bank ''*or others dealing with the bank*,'' he answered, ''I carried the book over from the Mercantile Bank to the Commerce Trust Company under my arm.''

It appeared that the witness was employed by the Commerce Trust Company at the time of the merger.

I. The conviction was under Section 4653, Revised Statutes 1909. It is urged by appellant that the information does not charge an offense under that statute and that the evidence will not support a conviction of guilt. The section is as follows:

**Elements of Crime.**

''Sec. 4653. False entries in books of corporations, third degree.—Every person who, with intent to defraud, shall make any false entries, or shall falsely alter any entry made in a book of accounts kept by any moneyed corporation within this State, or in any book of accounts kept by any such corporation or its officers, and delivered or intended to be delivered to any person dealing with such corporation, by which any pecuniary obligation, claim or credit shall be or shall purport to be created, increased, diminished or discharged, or in any manner affected, shall, upon conviction, be adjudged guilty of forgery in the third degree.''

Analysis of that section shows that the following facts must be shown to prove the commission of the crime: (a) There must be an intent to defraud; (b) there must be a false entry made in a book of accounts kept by the corporation; (c) by which some pecuniary obligation, claim or credit shall purport to be increased, diminished or discharged or in some manner affected; (d) the book must be delivered or must be intended to be delivered, (e) to some person dealing with the corporation.

There can be no serious question that the conditions a, b, and c were properly alleged and established by sufficient proof; there was undoubtedly an intent to defraud by the false entry in the cash journal and the account of William Toller was affected by the entry.

It remains to consider what is meant by "any person dealing with the corporation," and "delivered" or "intended to be delivered." Kornfeldt and Ruddy swore those books were delivered and intended to be **Delivery.** delivered to the officers of the bank, the examining committee of the directors. Such persons could not come within the definition of persons dealing *with* the bank in such examination as they conducted; they were acting for the bank—they were the bank. A person "dealing with the bank" in any transaction must be one who represents the other side. Doubtless the other persons mentioned in the evidence, the state bank examiner, the clearing house auditor, any stockholder or depositor, were "persons dealing with the bank," within the meaning of the statute.

There was testimony that the cash journal was intended to be "delivered" to the depositors, stockholders or clearing house examiner whenever they desired to examine it, but in explanation of that it is said by Mr. Ruddy that they were the people who "inspected" and "looked at" the books. It is not stated anywhere that the cash journal was permitted to be taken away from the bank; in fact, the evidence indicates that it was not. It was kept by the bank

and the only liberty allowed the persons last mentioned was to examine it. There is no definition of delivery, or deliver, which does not involve at least temporarily a change of control or of possession. [18 C. J., p. 476; State v. Mills, 146 Mo. 195, l. c. 204; State v. Watson, 65 Mo. 115, l. c. 122; Chambers v. Chambers, 227 Mo. 268; Thomas v. Thomas, 107 Mo. 459; Gartside v. Pahlman, 45 Mo. App. 160; In re Estate of Soulard, 141 Mo. 642; Sneathen v. Sneathen, 104 Mo. 201; Standiford v. Standiford, 97 Mo. 231; Mudd v. Dillon, 166 Mo. 110; McNear v. Williamson, 166 Mo. 358.] We cannot assume that the Legislature in the use of a word in the enactment intended to give it a meaning radically different from that which ordinarily attaches to it, without some explanation of such intention. If it had been the intention of the Legislature to declare a crime is committed in making a false entry in a book to be "inspected by," or "exhibited to," or "examined by" any person dealing with the bank, it would have been not only easy, but it would have been the obvious thing, to use such words in describing the crime. Of course we cannot say what reason actuated the Legislature in so restricting the operation of the statute. We can only give it effect as it reads.

Manifestly the definition under consideration would apply to pass-books kept and intended to be delivered to the customers of the bank. But there was no false

Pass-book. entry nor alteration in the pass-book of Mr. Toller. His pass book showed exactly the correct statement of his account. There is no definite testimony that there was a false entry in the pass-book of Plotner the defendant, although it may be inferred from the testimony of Kornfeldt that Plotner's pass-book didn't show the true state of his account, because when the transfer was made to the Trust Company Kornfeldt worked all day on that pass-book to get it to balance correctly. While it didn't show the false entry in relation to the $200 the footings

in the pass-book probably were false. But the information does not charge that the false entry was made in his pass-book.

It was not necessary, in order to come within the meaning of the term "deliver," to place the book *permanently* beyond the control or demand of the bank, as in case of gift or sale, as involved in some of the above cases. There may be a delivery for the purpose of inspection, or a conditional delivery; yet, in any such case, there would have to be temporarily a transfer of actual and absolute control of the bank. Would the State Bank Commissioner, his deputy and the bank examiners, in the examinations of the bank which the law required them to make, possess such control in any degree different from that enjoyed by stockholders and clearing house examiners? Undoubtedly, yes. Under Section 1080, Revised Statute 1909, amended by Laws 1911, pp. 91, 92, the Bank Commissioner and subordinates are required to visit and examine every bank and trust company doing business under the laws of this State. They have power to cause proceedings to be instituted against any bank which they find mismanaged, and if they find its continuance in business will seriously jeopardize the safety of its depositors, they are authorized to "close said bank" and take charge of its property and effects (R. S. 1909, sec. 1081), and may appoint a special agent to take charge, pending the appointment of a receiver. Obviously, in making their examinations, the Bank Commission and examiners have absolute control of the books of the bank; the books must be "delivered" to them for that purpose. They are persons "dealing with the bank." Persons dealing with the bank also would include any one who might at any time purchase the bank or negotiate with the bank for that purpose. Kemper and the Trust Company would come within that definition.

Now the intention of the defendants in regard to delivery of the book is immaterial. The words, "intended to be delivered" used in the statute refer to the intention

Intention. of the corporation which owns the book, the purpose for which the book is kept. The criminal must entertain an intention to defraud, but it does not matter against whom the intention would operate (Sec. 4921, R. S. 1909). Obviously the delivery of, or intention to deliver, the book in which the false entry is made, is no element of the crime so far as it includes the intent and acts of the defendants. That is merely a description of the conditions under which the crime may be committed, the instrumentalities at hand which the criminal may use in the perpetration of his crime. The entry must be made in that kind of a book.

It is not alleged that the *bank* intended to deliver the book to any person, or kept it for that purpose. While the proof is sufficient to show the commission of the crime by making a false entry in a book intended to be delivered to persons dealing with the bank, the information is defective in failing to make the necessary allegations concerning that element. For that reason the cause will have to be reversed.

II. It is claimed by the appellant that the crime is not proved, because Plotner directed Kornfeldt not to Conspiracy. charge the particular check in question to the account of Toller, and therefore the false entry was made in direct violation of the defendant's direction.

Plotner's checks falsely charged to other accounts had been coming through since August and some of them charged to Toller's account. The check which caused the false entry mentioned in the information was drawn September 11th. On cross-examination Kornfeldt said that Plotner had told him to charge the check of September 11th to some account that he had not manipulated before. The reason was, as the witness explained, he had so much money off of other accounts that Plotner told him to pick out an account "that had some money that would stand that." After considering the various accounts to which he might make the charge, the witness said he could not run any chances by taking it off an account that might

have a big pay-roll at the end of the week and wipe off the balance. Therefore he charged it to Toller's account again, because he knew his account would be good for it.

It will be borne in mind that Plotner in the first instance instructed Kornfeldt how to conceal the shortage by charging it to someone whose account would be good, and Kornfeldt carried out the instruction as best he could. The mere suggestion that he pick out some account that had not been manipulated was general; it didn't particularly designate Toller's account as one to avoid, nor imply that Kornfeldt should not use any discretion in the matter. He was conforming to the desire of Plotner when he selected an account which, as Plotner indicated, "would stand it." The conspiracy between the two was clearly and perfectly shown. The general purpose of the conspiracy was to get the money and make false entries to conceal the act. What one conspirator did in carrying out the general purpose was the act of the other, even though they might differ in unimportant details as to how the scheme should be carried through. The particular account to be selected for the purpose of manipulation was necessarily left to the judgment of Kornfeldt.

If two or more persons agree together to commit some crime and enter upon the commission of the crime, and one of them, in pursuance of the common design and for the purpose of carrying it out, performs some criminal act different from that in contemplation of the parties at the outset, the others will be guilty of the criminal act. The doctrine is fully explained and illustrated in the case of State v. Darling, 216 Mo. 450, 1. c. 458 to 464. See also People v. Friedman, 45 L. R. A. (N. S.) 55, note. The point is without merit.

III. Appellant assigns error to the admission of evidence showing numerous other checks besides the one under consideration, all followed by false entries, drawn by the defendant. Other crimes of the same character may be proven for the

Other
Crimes.

purpose of showing the intent with which the act charged was done, when the crime is of a character such as is shown in this case. Several late cases fully elucidate the limits of the rule. [State v. Hill, 201 S. W. 58, l. c. 60; State v. Cummins, 213 S. W. 969, l. c. 974; State v. Patterson, 271 Mo. 99, l. c. 110.]

IV. It is claimed by appellant that the case is barred by the Statute of Limitations. The false entry was made September 14, 1914, and the information on which the trial was had was filed September 26, 1917, more that three years thereafter. An information was filed Limitations. charging the same offense September 10, 1917, within the three years. The point appellant makes is that the information on which the trial was had is not shown to be an amendment to the first information and bears a different number. However, there appears in the record an order of court to the effect that the State was given leave to file an amended information in case No. 15130, the number in which the first information was filed, and the order recites that by mistake the amended information was given a different number. The court thereupon entered an order correcting the number so as to show the information upon which the case then being tried was the same case as that in which the first information was filed. Thus the record shows the Statute of Limitations does not bar the action.

V. Appellant makes the point that no offense was committed because Section 4653 uses the word "entries" in describing the crime, and therefore a single false entry would not be a violation of the law.

Section 8053, Revised Statutes 1909, is as follows: "The Singular Included Under the Plural.—Whenever, in any statute, words importing the plural number are used in describing or referring to any matter, parties or persons, any single matter, party or persons shall be deemed to be included, although distributive words may not be used."

Appellant points out that Section 4653 as originally enacted contained the singular "entry" and in 1845 was amended making it plural, "entries," and argues that the amendment indicated an intention to change the meaning and exclude the application of the act to a single entry.

Section 8055, Revised Statutes 1909, however, provides that the rules prescribed in Section 8053 and Section 8054 "shall apply in all cases unless it be otherwise specially provided, or unless there be something in the subject or context, repugnant to such construction."

That provision excludes the possibility of a construction which would limit the operation of the word "entries," as Section 8053 says it shall *not* be limited. The construction which appellant desires to apply is not "specially provided," nor is there anything in the "subject or context" of Section 4653 defining the offense which is "repugnant to" the construction definitely required by Section 8053. Section 8053 was enacted long before and was the law at the time the amendment of Section 4653 in 1845 changed the word "entry" to "entries." The Legislature must be presumed to have made the change with a full understanding of the construction which Section 8053 would apply to it.

The judgment is reversed and the cause remanded.

*Railey* and *Mozley, CC.,* concur.

PER CURIAM:—The foregoing opinion of WHITE, C., is adopted as the decision of the court. *Williams, P. J.,* and *Walker, J.,* concur; *Williamson, J.,* not sitting.