**STATE of Missouri, Respondent,**

v.

**Jasper Lee DAVIS, Jr., Appellant.**

**No. 51527.**

Supreme Court of Missouri,
Division No. 2.

Nov. 8, 1971.

John C. Danforth, Atty. Gen., G. Michael O'Neal, Asst. Atty. Gen., Jefferson City, for respondent.

Lashly, Caruthers, Rava, Hyndman & Rutherford by Alan J. Steinberg, St. Louis, appointed counsel for appellant.

BARRETT, Commissioner.

In February 1965 a jury found that in stabbing and killing James Ready the appellant, Jasper Lee Davis, Jr., was guilty of murder in the first degree and fixed his punishment at life imprisonment.

The judgment in that case was appealed and affirmed in 1966 in State v. Davis, Mo., 400 S.W.2d 141. Upon that appeal, however, Davis was not represented by counsel. The consequence was that when in March 1970, Davis filed a motion to vacate the judgment upon the ground that he was not represented by counsel this court sustained his motion, the judgment was set aside "and for naught held" and the cause was reinstated on this court's docket. Counsel was appointed to represent Davis, briefs were duly filed and his cause has been argued and submitted. The reinstatement of appellant's cause was in what was deemed to be the spirit of the Bosler cases. Bosler v. Swenson, 363 F.2d 154, Swenson v. Bosler, 386 U.S. 258, 87 S.Ct. 996, 18 L. Ed.2d 33.

■ One substantive point is urged but there is a secondary question—that the court erred in not permitting the defendant upon cross-examination of Johnny Mason to elicit from him, "to show interest," the fact that he had been "incarcerated" by the juvenile court for his participation "in the events leading to the death of James Ready." This is not the identical problem involved on the previous appeal (400 S.W. 2d l. c. 147–148), nevertheless, the assignment of error in both instances is governed by the law relating to "neglected and delinquent children," V.A.M.S.Supp. §§ 211.-271, 211.321, and upon this record the court did not abuse its discretion in refusing to permit the attempted cross-examination of Mason. State v. Tolias, Mo., 326 S.W.2d 329, 333.

■ The court submitted first and second degree murder, manslaughter and self-defense. The only substantive point urged upon this appeal is the assignment that there was no evidence permitting of the inference of *deliberation* and therefore, Davis could not be convicted of murder in the first degree. The events leading up to the death of James Ready, on April 22, 1964, at the hands of Jasper Lee Davis, Jr., are detailed at 400 S.W.2d 141 and it is necessary here to carefully note only such facts and circumstances as bear upon or are supportive of the finding of *deliberation* as that term is employed in the law of murder in the first degree; "any other kind of willful, *deliberate* and premeditated killing." RSMo 1969, § 559.010, V.A.M.S. In that connection it is not necessary to repeat the general rules with respect to time, 'cool blood" and the various definitions and factors entering into the essential element of deliberation. Neither is it necessary to consider any presumptions arising from an admitted homicide or to comment upon the burden of proof other than to again say that deliberation may be inferred and established circumstantially or, as sometimes put, "from the circumstances of the homicide." Thus the single problem here is what inferences are reasonably permissible upon this record from the circumstances of the homicide. State v. Small, Mo., 344 S.W.2d 49, 51; annotation 86 A. L.R.2d 656.

■ On April 22, 1964, six young men from St. Louis University attended an opening night baseball game at old Sportsman's Park. About 11 o'clock, all in one automobile, they were returning to a university dormitory on Pine Street when they "got tied up in traffic" as they headed south on Grand Avenue. Lough, the driver of the automobile, having "to go to the bathroom," turned the driving over to one of his companions and proceeded to an alley off Grand. The automobile was compelled to move forward with the traffic and after driving around two or three blocks the boys were unable to pick up

Lough and so Kennedy, Jim Ready and Mike Caccamo, age 28 when the case was tried, got out of the automobile and Ready and Caccamo walked north on Grand looking for their friend. At Grand and Bell, opposite the Veteran's Hospital, they saw a gang of black boys, ten to fifteen, approaching in the opposite direction and so they "put our heads down and walked on the building side," Ready followed by Caccamo. While the ten to fifteen black boys were not a named, organized band, they were generally known to one another and had congregated from various sections of the area and as they proceeded south on Grand, looking, some of them said, for a straight-edge razor one of their number, Johnny Mason, had lost. These boys ranged in age from sixteen to eighteen and one of them, Mason, while only sixteen was a boxer—boxed for the Vashon Athletic Club.

Noting only the testimony of the black boys, particularly that of Mason, Jesse Calhoun and Davis, Mason and Calhoun being called by the state, these were the immediate circumstances: The two white boys were unarmed while Davis, then age 18, was carrying a knife in his right jacket pocket. He says that he had found the knife a few days previously. He said that it was a jackknife with a bone handle "had little grooves in it for when you can get the knife open fast you pop it open instead of pulling it open with two hands." He had oiled the knife and could and did open it in his pocket with his thumb. The knife was sharp-pointed and while he said the blade was three inches long his friend Calhoun said "it was about three or four inches." While upon Grand and Delmar, Mason had seen Davis with the knife. He was "(s)howing it to me, popping it open, just showing it. * * * Showing it and popping it."

As the white boys approached one of the black group, Booker Simmons, according to Davis, said, "Here come two white dudes. Do you want *to off 'em?*" Mason defined "off 'em" as slang meaning "for hit-

ting somebody, jumping on somebody." He said that the term did not have a precise meaning, "it could mean anything" including to "Jump somebody." Davis said, "It means jump on them, beat them up." Calhoun said, "It means to hit them." Whatever their definitions and the true meaning of the term when the white boys were six or eight feet away, Mason said, "Let's off these White dudes." Accordingly, Ready in the lead passed three or four or more of the black boys, head down, with Caccamo following. According to Mason "the second boy (Caccamo) bumped into us," in any event Mason hit Caccamo in the jaw with his closed fist and he fell to the sidewalk. Mason says that Caccamo started "getting back up" but Calhoun said "he laid there with his eyes closed on the ground" and Terry Harris and another boy kicked him in the head, back and face. One boy said that Terry was "stomping" Caccamo.

Ready having passed the group, looked back and saw his companion on the sidewalk being stomped and kicked and he ran back "swinging" wildly. He may have been "swinging" at Mason. If so he missed Mason and, flailing wildly, out of a group then consisting of seven or eight struck Davis, who fell to the sidewalk, apparently on his back. Mason said, however, that Davis "jumped up and started swinging back." Calhoun, describing the immediate encounter, said, "this white boy swung at Mason and Mason weaved out of the way, and that is when he struck Jasper Lee Davis" and "that is when Jasper Davis went in his pocket and got his knife. * * * he came out of his pocket with the knife. * * * he brung it out and brung it up and stuck the boy somewhere in his chest," and then "he took off." Davis says that he ran north on Grand, then to Cass to Bacon and at Windsor and Grand "dropped the knife." The coroner's physician performed an autopsy on Ready, age 28, weight 185 pounds, height 5 feet 6 inches. He described the fatal wound as "a penetrating stab wound on the left side

of chest four inches, but it was four inches from mid line between the 6th and 7th ribs, one half inch in length, and two and a half inches in depth." The cause of death was a "(p)enetrating stab wound of heart severing coronary artery."

Appellant's counsel, stressing the technical definition of "deliberation" suggests that Davis more or less stood apart from "offing the white dudes," that in fact Ready and Davis were in "a gang fight" and there was therefore no conscious, deliberate purpose to murder Ready. It may be that in one sense or view there was no specific intent by the group against Ready but against any "white dude." And while Davis sought to put himself in the position of an onlooker only, the fact was that he did not dissent from the group of ten to fifteen who proposed to "off the white dudes" and after the larger group was reduced to seven or eight in the attacks on Caccamo and Ready, Davis was in that group. There may not have been, classically, a conspiracy but it was a fair and reasonable inference from the circumstances that, even though on the spur of the moment, there was concerted action, a compact of ten to fifteen confederates "combine(d) together to commit an unlawful act." Appellant did not dissent from the general purpose to "off these white dudes" and there was no agreement that the assault was to be limited to fists, the evidence admits of the plain inference "to assault and whip the deceased without any such limitation." State v. Darling, 216 Mo. 450, 463, 115 S.W. 1002, 1006; 40 Am.Jur.2d (Homicide) § 47, p. 338. In connection with the concerted action and a circumstance from which deliberation may be made to appear is the "manner of employment of a deadly weapon used upon a vital part of the body." State v. Page, Mo., 130 S.W.2d 520, 523. Here in reasoning upon the external or objective circumstances in the ascertainment of Davis' subjective state of mind (annotation 96 A. L.R.2d 1435, 1441; 86 A.L.R.2d 1. c. 656) is the fact of a concealed weapon—here

stealthily employed. This is Davis' own version of his fatally stabbing Ready:

"A. I tried to cut him but I stuck him because I had been drinking.

Q. You say you stuck him, did you strike down?

A. No, sir.

Q. Did you strike from the side or did you strike coming up?

A. I struck him from the side.

\*    \*    \*    \*    \*    \*

Q. Did you have some object or something under the blade so you could open it?

A. No, sir. The kind of knife I have, I've got a little groove in it so you could pop it open fast with your thumb.

Q. Is that what you did?

A. Yes, sir."

Thus in addition to concert of action to do an unlawful act, dangerous in character in that "its accomplishment will necessarily or probably require the use of force and violence, which may result in the taking of life" (40 Am.Jur.2d § 35, p. 326), there was a concealed deadly weapon, one that had been prepared for quick use and it was intentionally "stuck" directly into the victim's heart. And, there was a "dropping" of the bloody knife as Davis fled. In short, in all the circumstances, particularly the circumstances attending the killing, the inference of deliberation was a fair and reasonable one and found by the jury supported the verdict of murder in the first degree. State v. Small, supra; State v. Darling, supra; 40 Am.Jur.2d § 265, p. 528.

For the reasons indicated the judgment is affirmed.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM:

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

All of the Judges concur.