**STATE of Missouri, Respondent,**

v.

**James William MITCHELL, Appellant.**

**No. 52066.**

Supreme Court of Missouri,
Division No. 2.

Nov. 14, 1966.

Norman H. Anderson, Atty. Gen., Jefferson City, Frederick E. Steck, Special Asst. Atty. Gen., Sikeston, for respondent.

Raymond A. Bruntrager, St. Louis, for appellant.

PRITCHARD, Commissioner.

Defendant, having waived his right to trial by jury, was tried to the court, found guilty, and sentenced to life imprisonment for the commission of the crime of murder in the first degree. He here · contends solely that the evidence was insufficient to support such finding, having briefed the matter to this court by counsel who was present with him throughout the trial. The testimony of witnesses, bearing upon the judgment of conviction, follows:

On March 31, 1965, William DeVoto was in the Dutch Maid Grill, 1300 Hodiamont Avenue in St. Louis, in the early morning hours with some friends, Carl Skaggs, Bernie Neumann, and deceased, Everett Barton. While they were sitting around getting coffee, defendant was there and wanted to play the pinball machine, and was telling the lady behind the counter that she had to pay him off for the games he won. He had not yet put money

into the machine. Defendant argued with the lady behind the counter, getting pretty loud. Barton, the deceased, was at the end (of the counter) closest to defendant. Deceased stood up and they started fighting, falling under the pinball machine in the corner. DeVoto saw that defendant had a pistol in his hand, so he and Bernie ran over and tried to take the gun from him, but they let him go. Defendant got up and everyone else sat down. Defendant came up and "hollered" at Barton, "Don't think I wouldn't shoot you." Defendant shot into the air and left. About ten minutes later defendant returned and said, "Don't think that I wouldn't kill you." At that time Barton was standing with his back to the door, facing away from defendant who shot him. Ten minutes later the police walked back in with defendant, and showed DeVoto a gun which appeared to be similar to the gun he had previously seen in defendant's hand. Barton did not have any weapon in his hand.

According to DeVoto, Barton had four or five bottles of beer, but didn't appear to be drunk in the 3½ hours he was in the group. Barton was seated next to DeVoto at the counter, and defendant was also sitting on a stool, five or six places away from them, and was going back and forth from it to the pinball machine. Defendant kept saying he wanted to get paid off for some pinball games, and she (the waitress) was saying they couldn't pay off on a pinball machine. Defendant started saying, "I am from the West, and you can't tell me that." They all stood up and defendant and Barton started fighting, rolling under the pinball machine. DeVoto never saw Barton raise a stool, or come down with it on the side of defendant's head. Barton was lying on his back on the floor, defendant was on top of him with a pistol in his ribs. DeVoto grabbed the pistol and tried to pull it away from defendant. Defendant was then "mad" and excited. Everybody said just to forget everything. He and Barton had each other's hats, and defendant said, "Give me my hat back."

They traded hats and everybody sat down. Defendant stood there for a minute and said, "Don't think I wouldn't have shot you," and he shot up in the air and walked out. Defendant said, "Nobody pushes me," or "takes advantage of me," or something, because "I am from the West."

Myrtle Simmons was a waitress at the Dutch Maid Grill on March 31, 1965, at about 1:30 a.m. Four men and one woman came in, sat down and ordered coffee. A little later another man, the defendant, came in and ordered coffee too, and complained that it was not fixed the way he wanted it. She put sugar (or cream) in his coffee as he asked, and he went over to play the pinball machine and got into an argument with the other employee. One of the first group complained that defendant was talking too loud, after which he and defendant began to scuffle and fight. Defendant had a gun in his hand and "had it on" the man while they were fighting. Three men who were with the first group tried to break it up and when they saw the gun, they quit. The defendant and the man broke up the fight themselves, after which defendant left. He walked down the street a little way and in a minute or two he came back, walked up behind the first man and shot through the ceiling. He left again and in about the same amount of time came back, saying something like "I'm going to shoot you," and shot the man in the back. Barton, the man who was shot, said nothing on the last occasion. Myrtle's version was further that she saw a counter stool in Barton's hand when he was advancing on defendant before the fight started, but she did not see him hit anyone with the stool, or swing it. She did not see any marks, cuts or bruises on defendant. On cross-examination she testified that she didn't know whether Barton brought the counter stool down on defendant's head. When defendant came back into the grill the second time (after a moment or two) he was upset and angry—he was not calm or cool. In the interim a man in pajamas came in to object to the

noise—before the shot was fired in the ceiling.

Patrolman Charles Farrell assisted in defendant's arrest, and upon search found a loaded pistol in his left inside coat pocket. The pistol was identified and there was evidence that the bullet taken from deceased's body was fired from it.

Leroy Williams was the man who appeared in pajamas at the Dutch Maid Grill, over which he resided. His testimony was that he was awakened by a noise; seemingly somebody was fighting, and he put on his bathrobe and ran downstairs to see what the excitement was. He saw defendant there with a gun in his hand, with which he shot up in the ceiling. Defendant then walked out and Williams went out also. He told defendant to go on home, and defendant replied, " 'I am not going home, I'm going to kill me' a so and so." Defendant went back inside the restaurant and fired one shot into Barton's back. At no time did Williams see any marks, cuts or bruises on defendant. Defendant seemed to Williams to be quite nervous, but was not agitated. Defendant had walked a half block to an alley and back before shooting Barton.

Olin McCrary was in the Dutch Maid Grill on the occasion here in question. He heard defendant say to the effect, as he came in the door, "I am from the west coast, and where I am from I get service." After ordering coffee, defendant went to the pinball machine and asked the waitress if it paid off. She said that it did not. Defendant said, "Well, if I win, if I win, I want my money, I want the machine to pay me." He said also, if he won and didn't get his money he would shoot the boss. Someone of another group which had come in (either before or after defendant) said, "Oh, shut up," and defendant walked over to them. McCrary saw a stool in the air, and it seemed to him that the guy was hit on the shoulder. Later, outside the grill, McCrary overheard defendant say "that he should shoot that so and so." He saw defendant with a gun in his hand both inside and outside the building. He then saw defendant go back into the restaurant and fire a shot into the ceiling. Defendant came back in about a minute, and McCrary heard a shot, looked around the partition of the kitchen (where he was) and saw deceased fall.

Dorothy Hornbeck was at the time of the homicide employed by the Dutch Maid Grill. She saw Barton and four others come into the grill and order coffee. They were sitting there drinking coffee and playing the juke box when defendant came in and ordered coffee with cream and sugar. She served him with cream only and he told her that where he came from they put sugar in his coffee and "he made a big issue of it." Dorothy walked away from him and Myrtle put sugar in the coffee. Defendant then went to the pinball machine and put a nickel in it and asked Dorothy if it paid off. She told him no, that it was for amusement only. Defendant then said, "If I win, I will get my money or I will blow somebody's head off." At that time he pulled back his coat lapel and showed her his pistol. He followed her and she went to the telephone to call the police, during which time defendant and Barton got into a scuffle, wrestling on the floor, and when she returned defendant was on top of Barton with a gun on him. The others tried to separate the two, but defendant and Barton broke up the fight themselves. They had their hats mixed up so they exchanged, shook hands, and defendant told Barton he was lucky he didn't kill him. Barton said, "Yes, I am," and he laughed. He turned around to drink his coffee and defendant left. In two or three minutes he returned, fired a shot into the ceiling and left again. In about the same length of time he came back in and said, "I'm going to kill you," and he shot Barton in the back. On cross-examination Dorothy testified that Barton did not hit defendant with the counter stool. She saw Barton "start up with it."

Defendant's version of the incident, testified to by him, was that when he was standing at the pinball machine he was struck in the left side of his head from behind by someone unknown to him. It knocked him out, and he next remembered being on the floor with a man over him taking the gun and trying to put his (defendant's) finger between the trigger bar to shoot him. The man had the gun toward defendant's heart. Defendant pulled the gun away from his heart and fired it into the ceiling. There were five men on top of defendant beating him, and when he fired they all ran and defendant walked to the door. As he reached the door he heard a noise, turned and pulled the trigger. He was upset and the gun went off. He did not remember it hitting anybody. Defendant testified he was in a daze, was unconscious and angry because someone had hit him for no reason at all. He had no words with anyone except the waitress whom he asked about the pinball machine and his coffee. He left the grill, walking from Hodiamont to Easton where the police arrested him. He testified that he was hit so severely that he could hardly move his legs—he couldn't run. He was in the grill a total of five minutes, two minutes elapsing from the time he was knocked down until he whirled and fired the shot.

On rebuttal, the state produced Detective Robert Boaz, who testified that defendant told him that after he was struck two other parties started to jump on him and he pulled a gun out of his pocket and it accidentally discharged. He then walked out of the restaurant and while standing in front of it he got mad because he had been pushed around inside. He took the gun out of his pocket again, walked in the restaurant, shot Everett Barton while he was sitting on the seat, and he then left the premises. Officer Paul Spavor testified he took defendant to the St. Louis City Morgue where defendant stated that Mr. Barton, whose body was there viewed, was the man whom he had shot.

It was stipulated that there were no weapons found upon deceased, and that upon test deceased's blood was determined to contain 0.32 percent alcohol.

Defendant argues that he lacked the requisite deliberation to sustain the conviction for first degree murder because he was acting in the heat of passion. § 559.-010, RSMo 1959, V.A.M.S., sets forth that among the elements of a charge and sufficiency of evidence to sustain a finding of guilt of first degree murder there must be deliberation, premeditation and malice.

■ The elements of malice may be presumed from proof of an intentional killing with a deadly weapon, State v. Whited, 360 Mo. 956, 231 S.W.2d 618, 620 [2–4]. There is no question here but that defendant's use of the pistol was an intentional killing with a deadly weapon. The question is whether there was sufficient time for defendant to have "cooled off" from the anger and passion engendered by the fight with deceased, Barton. The elements of deliberation and premeditation may be inferred from the circumstances of the case. State v. Johnson, 362 Mo. 833, 245 S.W.2d 43, 46 [3, 4]; State v. Goodwin, Mo., 352 S.W.2d 614, 619 [2–4]. The facts here show that defendant, armed with a pistol, came into the Dutch Maid Grill in the early morning hours and exhibited a disposition to cause trouble. If he were not paid off for winning on the pinball machine, he was, according to waitress Dorothy, going to blow somebody's head off, whereupon he showed his pistol. The fight between defendant and deceased ensued, with defendant apparently the winner with the aid of his pistol which he "had on" deceased. These parties broke up that fight themselves, and, from all the evidence, defendant and deceased made up, exchanged hats, shook hands and parted. The next events are critical to defendant's claimed lack of premeditation because, he says, he was still acting in the heat of passion resulting from the fight with deceased. It is true, as defendant contends, citing State

v. Whited, supra, as parallel to the facts here, that he and deceased were unacquainted; deceased entered the quarrel between defendant and the waitresses over the pinball machine pay-off; deceased advanced on defendant with a counter stool in his hands. The fight ended with defendant on top of deceased (although defendant was smaller physically than deceased). Had the homicide occurred at this point there might be merit in defendant's contention that he killed deceased in the heat of passion, which removed malice and premeditation and which would then be insufficient to sustain the first degree murder conviction. That is, however, not what happened. Defendant left the restaurant, returned in about two minutes and fired the threatening shot into the ceiling, left the restaurant again, walked to an alley, returned (during which time Williams told him to go on home, and defendant replied, " 'I am not going home, I'm going to kill me' a so and so") again in about two minutes (witness DeVoto put the time at *ten* minutes) and shot deceased in the back. The matter of defendant "cooling off" was a fact determination for the trial court, and we rule that these facts were amply sufficient for him to find defendant's guilt of first degree murder. In the early cases of State v. Dunn, 18 Mo. 419, 424, and State v. Jennings, 18 Mo. 435, 443, the rule was laid down: "If the party killing had time to think, and did intend to kill, for a minute as well as an hour or a day, it is a deliberate, wilful and premeditated killing, constituting murder in the first degree." See also State v. Holme, 54 Mo. 153; State v. Snell, 78 Mo. 240; and State v. Speyer, 207 Mo. 540, 106 S.W. 505, 509, 14 L.R.A.,N.S., 836, where the court quoted State v. Kotovsky, 74 Mo. 247, " 'Deliberation is but prolonged premeditation. In other words, in law, deliberation is premeditation, in a cool state of the blood, or, where there has been heat of passion,

it is premeditation continued beyond the period within which there has been time for the blood to cool, in the given case. * * * Deliberation is also premeditation, but is something more. It is not only to think of beforehand, which may be but for an instant, but the inclination to do the act is considered, weighed, pondered upon for such a length of time after a provocation is given as the jury may find was sufficient for the blood to cool. One in a "heat of passion" may premeditate without deliberating. Deliberation is only exercised in a "cool state of the blood," while premeditation may be either in that state of the blood or in "heat of passion." ' " Here, defendant clearly had the time to cool off from the passion of the fight. The evidence shows that he pondered the act of killing: "Don't think I wouldn't have shot you"; that Barton was lucky he didn't kill him; and to the witness, Williams, " 'I am not going home, I'm going to kill me' a so and so." The shortness of time for deliberating and premeditating the killing is here immaterial. The evidence shows that both were done by defendant within the meaning of the law, and that the killing was revengefully done—i. e., "Nobody pushes me," or "takes advantage of me." There is sufficient proof to sustain the conviction.

We have examined the specified matters of Criminal Rule 28.02, V.A.M.R., and find no error.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

All of the Judges concur.