STATE of Missouri, Respondent,

v.

Willie Ray TURNER, Appellant.

No. 61974.

Supreme Court of Missouri,
En Banc.

Oct. 13, 1981.

Dissenting Opinion on Denial of
Rehearing Nov. 10, 1981.

Gary L. Robbins, Public Defender, Jackson, Antoinette Kirsch, Clayton, Walter S. Drusch, Jr., Cape Girardeau, for appellant.

John Ashcroft, Atty. Gen., John Reed, Asst. Atty. Gen., Jefferson City, for respondent.

RENDLEN, Judge.

Convicted on two counts of capital murder and sentenced to consecutive terms of life imprisonment without probation or parole for 50 years, § 565.008.1, RSMo 1978, defendant seeks review in this Court. The cause falls within our exclusive appellate jurisdiction under Art. V, Sec. 3, Mo.Const.

Defendant's allegations of error include: (1) insufficiency of the evidence to support capital murder convictions; (2) improper exclusion of hearsay testimony as to an accomplice's declaration against penal interest; (3) the sentences are violative of the Cruel and Unusual Punishment provisions of the United States and Missouri Constitutions; and (4) erroneous refusal to permit defense counsel's withdrawal or to permit defendant to personally call and examine witnesses.

## I.

Examining for sufficiency of the proof, we accept as true all evidence, direct or circumstantial, and all reasonable inferences supportive of the verdict and disregard those portions of the record contrary to a finding of guilt. *State v. Strickland,* 609 S.W.2d 392, 395 (Mo.banc 1980). Our function is not to weigh the evidence, but rather to determine whether there was sufficient proof from which the jury could reasonably have found defendant guilty as charged. *State v. Kelly,* 539 S.W.2d 106, 109 (Mo.banc 1976).

The record discloses that between 6:30 and 7:30 on the evening of December 20, 1978, the bodies of two men were discovered in a liquor store in Caruthersville, Missouri. One of them, Pierce Neeley, was lying face down in a pool of blood near the front of the store with a beer bottle bearing defendant's fingerprint beneath his body. The other victim, William "High Pockets" Parker, the store's operator, was discovered supine on the floor behind a counter. Parker was a large man, approximately 6 feet 3 inches in height and weighing about 260 pounds. Except for one broken bottle, the racks of chips and shelves of liquor had not been disturbed evidencing little or no sign of a struggle. The cash register and Parker's billfold had been emptied of money.

An autopsy revealed Parker suffered multiple stab wounds in the chest and abdomen and a large laceration caused by a blunt instrument to the back of his head, possibly producing a concussion. During Neeley's autopsy, nine stab wounds to the front and six to the back of his torso were found, as well as a scalp laceration from a blunt object which could have caused unconsciousness. Each man probably died from his chest wounds.

Frances Mitchell, Johnny Mitchell's wife, and Brenda Hall, Frances' daughter, testified that on the evening of December 20, 1978, defendant came to the Mitchell home and about 30 minutes later left with Johnny, who was armed with a pistol. When they returned at approximately 10:00 that night, Johnny gave Brenda and her siblings some change.

Defendant, in his videotaped statement, admitted that on the night of December 20, 1978, he went to Johnny Mitchell's home near Steele, Missouri, where Mitchell told defendant he wanted to go somewhere and "make him a hussle" (commit a robbery). They left the house in defendant's truck with defendant driving, and went to a liquor store in Caruthersville, arriving sometime after "dusk dark". Mitchell, who was armed with a pistol and a knife, told defendant that he knew the two men in the

store, having "borrowed money from them before", and "was going in there and borrow some money from them and if he didn't get it one way he was going to get it other one." Defendant, dressed in a blue repairman's outfit bearing the word "Willie" (his first name), entered the store with Mitchell, and each purchased a beer. Returning to the truck, the two men waited a few minutes for Neeley to leave, but apparently convinced that Neeley was staying, Mitchell asked defendant to drive around the corner and park the truck a block away. When defendant returned to the store, he found Mitchell standing over Neeley, hitting him with a gun. Neeley's back was bleeding from stab wounds, and when Mitchell went behind the counter to get a money sack, defendant, observing that Neeley was attempting to pull himself up, hit Neeley on the head with a beer bottle. Mitchell returned to the front of the store, and he too struck Neeley with a beer bottle, breaking it, then struck him again with the gun. When Neeley fell, defendant and Mitchell ran from the rear door through the alley to defendant's truck. Defendant claimed he then asked why Mitchell had killed the two men and Mitchell stated he wanted no witnesses. After Mitchell divided the stolen money, defendant bought some gas, drove Mitchell home and returned to his residence.[1]

Defendant particularly complains the evidence was insufficient to establish the required mental state for capital murder, § 565.001, RSMo 1978, that at most it showed an intent to rob supportive only of murder in the first degree. § 565.003, RSMo 1978[2] (formerly known as felony murder). This contention misses the mark. The State need not produce direct evidence of a defendant's premeditation and deliberation; instead, the mental elements establishing murder may be proved by indirect evidence and inferences reasonably drawn from circumstances surrounding the slaying. *State v. Lindsey*, 507 S.W.2d 1, 4 (Mo.banc 1974); *State v. Mitchell*, 408 S.W.2d 39, 42 (Mo.1966); *State v. Williams*, 369 S.W.2d 408, 417 (Mo.banc 1963); *State v. Page*, 130 S.W.2d 520, 523 (Mo.1939). Additionally, premeditation need only be shown to have existed a moment before the slaying and is present if the accused reflects on his act for any length of time before acting, and deliberation is proved when the killing is performed with "a cool and deliberate state of mind." *State v. Strickland*, 609 S.W.2d 392, 394 (Mo.banc 1980); *State v. Marston*, 479 S.W.2d 481, 484 (Mo.1972). In this connection, it is worthy of mention that direct proof of the required mental state is seldom available and such intent is usually inferred from circumstantial evidence. *See, State v. Beckemeyer*, 423 S.W.2d 687, 688 (Mo.1968); *State v. Lawson*, 585 S.W.2d 247, 251 (Mo.App.1979).

Though defendant asserts his videotaped statement demonstrates he did not participate in the stabbings nor intend the killings, the jury was entitled to disbelieve such exculpatory statements. *State v. Wilkerson*, 616 S.W.2d 829, 835 (Mo.banc 1981); *State v. Wade*, 535 S.W.2d 492, 495 (Mo.App.1976). Parker's size, as well as the location of the victims' bodies, renders defendant's version that Mitchell was the sole slayer highly unlikely. Additionally, defendant's continuation in the robbery, after Mitchell had evidenced his intent to dispose of the two men, sufficed to support the jury's determination that the requisite deliberation and premeditation were present.

---

1. Johnny Mitchell's convictions for capital murder were affirmed by this Court in *State v. Mitchell*, 611 S.W.2d 223 (Mo.banc 1981).

2. Section 565.001, RSMo 1978, provides as follows:
 "Any person who unlawfully, willfully, knowingly, deliberately, and with premeditation kills or causes the killing of another human being is guilty of the offense of capital murder."

Section 565.003, RSMo 1978, defining first degree murder, is as follows:
 "Any person who unlawfully kills another human being without a premeditated intent to cause the death of a particular individual is guilty of the offense of first degree murder if the killing was committed in the perpetration of or in the attempt to perpetrate arson, rape, robbery, burglary, or kidnapping."

*State v. Lindsey*, 507 S.W.2d 1, 4 (Mo.banc 1974). Further, defendant's exculpatory statement abounds with admissions pointing toward capital murder. His knowledge that Mitchell and he were easily identifiable as the robbers, combined with his striking of Neeley as he attempted to arise, demonstrates defendant's intention to join Mitchell's planned purpose of leaving no witnesses. Defendant need not personally have committed the killing. It suffices if he knowingly acted in concert with another for the common purpose of committing the offense, or knowingly and intentionally aided or encouraged the other in committing the offense.[3] MAI–CR 2.10, 2.12 and 2.14; *State v. Strickland*, 609 S.W.2d 392, 395 (Mo.banc 1980); *State v. Lute*, 608 S.W.2d 381, 384 (Mo.banc 1980); *State v. Grebe*, 461 S.W.2d 265, 267–68 (Mo.banc 1970); *State v. Taylor*, 391 S.W.2d 835, 837 (Mo.1965); *State v. Butler*, 310 S.W.2d 952, 957 (Mo. 1958); *State v. Easton*, 577 S.W.2d 953, 957–59 (Mo.App.1979), *cert. denied*, 444 U.S. 863, 100 S.Ct. 131, 62 L.Ed.2d 85; *Rowden v. State*, 493 S.W.2d 699, 702 (Mo.App.1973). Hence, the evidence could lead the jury to reasonably infer "defendant, acting alone or in concert with another 'unlawfully, willfully, knowingly, deliberately, and with premeditation' killed" Pierce Neeley and William Parker. *State v. Strickland*, 609 S.W.2d 392, 395 (Mo.banc 1980).

 Finally, the jury's determination that defendant was guilty of capital murder is not invalidated by the fact the evidence would have supported a first degree (felony) murder conviction, nor does this, as defendant urges, thwart "the statutory scheme enacted by the Missouri Legislature which manifested its intent that so-called 'felony murder' would no longer be treated as a capital offense, when it designed Sections 565.001, 565.003, and 565.008 of the 1979 Criminal Code." The jury was not required to acquit of capital murder and convict of first degree murder simply because the slayings occurred during the perpetration of a robbery.

## II.

Defendant next contends the trial court erred in excluding Michael Cooper's testimony concerning purported admissions to the actual slayings by Johnny Mitchell.[4] During trial, Cooper was called by defense counsel and offered the following testimony: On December 21, 1978 (the day following the murders), while Cooper was visiting in defendant's home, Mitchell, unaware of Cooper's presence, said to defendant, "I wasted those two punk-ass motherf_____s." Seeing Cooper enter the room, Mitchell then asked Cooper if he "knowed who wasted those two dudes." On two subsequent occasions, Mitchell allegedly made similar admissions directly to Cooper. The State's objection to Cooper's testimony as hearsay was sustained.

 Generally in Missouri, declarations against penal interests are not admissible exceptions to the hearsay rule in criminal proceedings. *See, State v. Brown*, 404 S.W.2d 179, 185 (Mo.1966); *State v. Williams*, 309 Mo. 155, 274 S.W. 427, 433 (1925); *State v. Hack*, 118 Mo. 92, 23 S.W. 1089, 1091 (1893); *State v. Ivicsics*, 604 S.W.2d 773, 780 (Mo.App.1980); *State v. Grant*, 560 S.W.2d 39, 42–43 (Mo.App.1977).[5] Nevertheless, relying on *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), defendant suggests that barring such evidence was violative of the Due Process Clauses of the United States and Missouri Constitutions and that after *Chambers*, we should unqualifiedly admit declarations against penal interests in crim-

---

3. The jury was instructed by MAI–CR 2d 15.02 modified by MAI–CR 2.12 and 2.10.

4. The unavailability of Johnny Mitchell requisite to the admission of his purported declaration against interest was established when Mitchell refused to testify when called asserting his Fifth Amendment privilege. *State v. Grant*, 560 S.W.2d 39, 43 (Mo.App.1977).

5. Even in jurisdictions where recognized, the exception requires as an essential element that the circumstances render it improbable a motive to falsify existed. See, 31A C.J.S. Evidence § 217; Fed.R.Evid. 804(b)(3). In other words, the hearsay statements must bear substantial assurances of trustworthiness.

inal cases. The Court in *Chambers*, however, *explicitly refused to so hold. Id.* at 302–03, 93 S.Ct. at 1049–10, 50. Further, the facts distinguish the present case because the "hearsay statements involved in *[Chambers]* were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability." *Id.* at 300, 93 S.Ct. at 1048. There, each declaration was made spontaneously to a close acquaintance and was corroborated by other substantial, reliable evidence including declarant's sworn confession, testimony of an eyewitness to the crime, evidence that declarant was observed with a gun immediately after the murder, and proof of declarant's prior ownership of gun like the murder weapon and subsequent purchase of a new weapon. Further, the number of statements (three) made independently to different persons and the fact that declarant obviously was aware that each statement was highly self-incriminatory and unquestionably against interest (after relating his involvement to one of the proferred witnesses, he urged the witness not to reveal his complicity to others) provided additional corroboration. In addition, the declarant was cross-examined by the State, and his demeanor and credibility considered by the jury. *Id.* at 300–01, 93 S.Ct. at 1048–1049.

While in a case such as *Chambers*, where substantial indicia of reliability appear *and declarant's complicity if true would exonerate the accused,* declarant's averments against an interest penal in nature may not be excluded, such circumstances requiring admission of the hearsay are missing here. When called to testify at defendant's trial, Johnny Mitchell refused, asserting his Fifth Amendment privilege, and thus was unavailable for a test of credibility. Nor was there corroborating evidence to insure the trustworthiness of his purported declarations. Equally important, the statements in themselves were not inconsistent with the showing of defendant's guilt. Defendant had placed himself at the scene and admitted a part in the planning and perpetration of the crime. Hence, Cooper's testimony might have aided the conviction, for if from other evidence the jury believed defendant guilty as an accomplice, the statements established Mitchell's complicity as a "principal." The proffered evidence did not, as in *Chambers*, exclude defendant as perpetrator by implicating Mitchell as an unabetted murderer.

We also observe that the dangers inherent in opening the door to extrajudicial confessions made by one not a party to the proceeding [6] militate against extending the rule of *Chambers* beyond the facts presented there.[7] *See, Taggart v. State,* 269 Ind. 667, 382 N.E.2d 916 (1978); *Ramirez v. State,* 543 S.W.2d 631 (Tex.Cr.App.1976); *State v. Smith,* 415 A.2d 553 (Me.1980). *See also, State v. Yates,* 442 S.W.2d 21, 28 (Mo. 1969).

Defendant further complains reversal is required under the holding of *Green v. Georgia,* 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979), that exclusion of similar

---

**6.** An example will serve to illustrate. "If the rule were changed, A could be charged with the crime; B could tell C and D [possibly seeking to build his criminal reputation or to exonerate A] that he committed the crime; B *could go into hiding* and at A's trial C and D would testify as to B's admission of guilt; A could be acquitted and B would return to stand trial; B could then provide several witnesses to testify as to his whereabouts at the time of the crime. The testimony of those witnesses along with A's statement that he really committed the crime could result in B's acquittal. A would be barred from further prosecution because of the protection against double jeopardy. No one could be convicted of perjury as A did not testify at his first trial, B did not lie under oath, and C and D were truthful in their testimony." *Chambers v. Mississippi, id.* 410 U.S. at 301, 93 S.Ct. at 1049.

**7.** It must be emphasized that the Supreme Court's determination due process had been denied stemmed from the Mississippi court's combined refusal to permit the defendant (1) to elicit testimony from the three witnesses respecting the declarant's extrajudicial confessions *and* (2) to impeach the declarant who under cross-examination by the state had repudiated his prior sworn confession. *Chambers v. Mississippi, id.* at 302, 93 S.Ct. at 1049.

evidence,[8] proffered during the punishment phase of trial, constituted denial of due process. Certainly such statements, cloaked with the safeguards for trustworthiness found in *Green*, could be pertinent to the issue of punishment; however, in the case *sub judice*, not only was Cooper's testimony *not* offered during the punishment phase of defendant's bifurcated proceedings, but its exclusion could not have been found prejudicial as defendant received the minimum punishment mandated for capital murder.

Finally, defendant claims unfairness by the admission of Cooper's testimony in Mitchell's trial and its exclusion here, but in so arguing defendant ignores a fundamental distinction. Cooper's testimony was admitted against Mitchell in a proceeding where Mitchell, as declarant, was in court and could choose to testify to refute Cooper's claim. In the present case, Cooper's testimony was offered against the State which could not force Mitchell to testify and hence had no means of testing the truthfulness of Mitchell's alleged statements. It is a well established "fact of trial life" that certain items of evidence may be introduced by one party and yet not by another. *Green v. Georgia*, 442 U.S. 95, 99, 99 S.Ct. 2150, 2152, 60 L.Ed.2d 738 (1979) (Rehnquist, J., dissenting).

In the criminal justice context denial of due process has been described as the failure to observe the fundamental fairness essential to the very concept of justice. *State v. Caffey*, 438 S.W.2d 167, 172 (Mo. 1969), *cert. denied*, 396 U.S. 853, 90 S.Ct. 114, 24 L.Ed.2d 102. No want of due process can be said to flow from the trial court's refusal to permit defendant to solicit this hearsay testimony. *U. S. v. Hughes*, 529 F.2d 838, 841 (5th Cir. 1976). Defendant's contention is denied.

8. The evidence urged in *Green* was, unlike that at bar, exculpatory in that the declaration placed petitioner away from the scene at the time of the murder.

9. On this portion of his appeal defendant was represented by Walter S. Drusch, Jr., counsel specially appointed to raise here defendant's allegations of his difficulties with trial counsel. While we normally do not consider in a criminal appeal a defendant's claim of ineffective

## III.

Defendant next asserts that imposition of a mandatory life sentence without probation or parole for 50 years, pursuant to § 565.008, RSMo 1978, violates the federal and state Constitutions' proscriptions against cruel and unusual punishment. Eighth Amendment, U.S.Const.; Art. I, Sec. 21, Mo.Const. These allegations have previously been addressed and determined contrary to the contentions here and require no protracted discussion. *See, State v. Borden*, 605 S.W.2d 88, 92–93 (Mo. banc 1980); *State v. Olinghouse*, 605 S.W.2d 58, 63–65 (Mo. banc 1980); *State v. Higgins*, 592 S.W.2d 151, 155–56 (Mo. banc 1979), *appeal dismissed*, 446 U.S. 902, 100 S.Ct. 1825, 64 L.Ed.2d 254 (1980).

## IV.

Finally defendant contends in his supplemental brief[9] that the trial court erred in failing to appoint substitute counsel as requested by defendant and his trial attorneys, denying defendant's Sixth and Fourteenth Amendment rights, and that the trial court erred further in refusing to permit defendant to personally examine alibi witnesses whom counsel had refused to call.

## A.

At trial, defendant was represented by two attorneys, Gary Robbins the Public Defender and John Fowlkes, court appointed counsel. On October 23, 1979, Robbins moved for leave to withdraw, followed by a "motion to appoint defendant as his own chief counsel" submitted by Fowlkes on October 29, 1979. A pretrial hearing on these motions revealed an earlier disagreement

assistance of trial counsel, *see, State v. Mitchell*, 620 S.W.2d 347 (Mo. banc 1981), we will review the complaints urged in the instant case where defendant is represented by different counsel for these allegations and the transcript provides a complete record of the trial circumstances of which defendant now complains. *See, State v. Banks*, 216 Kan. 390, 532 P.2d 1058 (1975).

between defendant and his attorneys, stemming from defendant's desire to present an alibi defense. In this connection, defendant had written to Robbins indicating he had no confidence in Robbins as his attorney. Following the testimonial hearing the motions were denied. At a second pretrial conference, on December 11, 1979, a motion for leave to withdraw filed by Robbins on December 7, accompanied by a "pro se motion [prepared by Robbins] to remove the Public Defender and for appointment of new counsel or in the alternative to proceed pro se", was also denied.

Defendant now maintains "both the defendant and his attorneys wanted to be relieved from each other and made their wishes clearly known to the Court", however, the record belies the present assertion of irreconcilable conflict. It has been said that "An irreconcilable conflict exists where there is a total breakdown of communication between attorney and client ...", *State v. Smith*, 586 S.W.2d 399, 401 (Mo. App.1979), and no such showing has been made here. Indeed, at both hearings defendant indicated the relationship with his attorneys was good. At the earlier hearing, repudiating his letter, defendant stated that he trusted Robbins, and was willing to cooperate and follow counsel's advice if he deemed it appropriate. At the December 11th hearing, defendant stated he wanted Robbins and Fowlkes to represent him, and their sole dispute centered on whether defendant should testify. Considering this testimony, the court appropriately concluded that while a particular problem existed, defendant had indicated a willingness to join counsel in its resolution.

▉▉▉ Also contrary to defendant's assertions, the record reveals defendant did not express a desire for new counsel until December 12, 1979, the date trial commenced and after impaneling of the jury. The trial court denied defendant's request, indicating it was too late for the appointment of new counsel. The granting of a continuance that defendant might secure

substitute counsel once trial has commenced is within the trial court's sound discretion, tempered by the public's need for effective administration of justice, and this discretion will not be lightly disturbed especially when it appears the accused was not denied skilled and competent representation. *State v. Gregory*, 595 S.W.2d 798, 800 (Mo. App.1980); *State v. Lee*, 521 S.W.2d 180, 182 (Mo.App.1975). An accused is not entitled to a particular attorney as a matter of constitutional right, nor may he work a continuance by discharging his lawyer without strong justification. *State v. Jefferies*, 504 S.W.2d 6, 7 (Mo.1974); *Evans v. State*, 467 S.W.2d 920, 923 (Mo.1971). We find no abuse of discretion.

### B.

▉▉▉ Defendant also claims trial court error in failing to appoint substitute counsel at the close of the State's case when it was again brought to the trial court's attention that defense counsel refused to present a proposed alibi defense. After some discussion, the trial judge resolved the dispute, ruling defendant might testify in narrative form if counsel refused to propound questions, but defendant would not be permitted to personally elicit testimony from witnesses. We can find no basis for reversal in this action. The determination of what witnesses to call, like other questions involving defenses to pursue, was a matter of trial strategy and, as defendant was represented by able counsel, the decision was best left within their province. *See,* American Bar Association Standards for Criminal Justice, The Defense Function, Standard 4–5.2 (2d ed. 1980); *State v. Banks*, 216 Kan. 390, 532 P.2d 1058, 1061–63 (1975). The trial court's ruling that defendant would be permitted to testify in narrative form constitutes a well conceived compromise, balancing an accused's constitutionally protected right to take the stand against his attorneys' obvious concern for what they deemed an attempt to mount an untenable claim.[10]

---

10. It must be remembered that the video-taped confession of defendant, found admissible by the trial court and not challenged on appeal, at the very least placed defendant at the scene of the crime.

Hence, rather than faulting the trial judge for failing to appoint substitute counsel, we commend his efforts in overcoming a seeming impasse.[11]

### C.

In the same vein, defendant charges ineffective assistance of counsel based on his attorneys' (1) advice against testifying and (2) refusal to call alleged alibi witnesses. To prevail on these assertions, claimant must demonstrate his attorney failed, to his prejudice, to exercise the customary skill and diligence of a reasonably competent lawyer rendering similar services under the existing circumstances. *Eldridge v. State*, 592 S.W.2d 738, 740 n. 2 (Mo. banc 1979); *Reynolds v. Mabry*, 574 F.2d 978, 981 (8th Cir. 1978). It is settled that defense counsel's attempt to dissuade his client from testifying, without more, does not fall to a level that may be characterized as incompetency violative of defendant's constitutionally protected rights. Such discouragement in the usual case amounts to advice on a question of trial tactics to which varying answers are tenable. *Hughes v. State*, 507 S.W.2d 363, 364–65 (Mo.1974).

Defendant's assertions respecting defense counsels' refusal to call his proposed witnesses must also fail. As stated in *Eldridge v. State, supra* at 741, "If an attorney believes that the testimony of an alibi witness would not unqualifiedly support his client's position, it is a matter of trial strategy not to call him to the stand.... An assertion against counsel's choice of trial strategy with respect to calling or not calling certain witnesses does not establish ineffective assistance of counsel." (citations omitted). *See*, American Bar Association Standards for Criminal Justice, The Defense Function, Standard 4–5.2 (2d ed. 1980). This rule particularly holds where, as here, the attorneys during investigation

contacted defendant's potential witnesses, but discovered nothing to sufficiently substantiate the suggested defense. *Jackson v. State*, 537 S.W.2d 211, 214 (Mo.App.1976). Additionally, to be entitled to relief, defendant must demonstrate how the purported testimony would have benefited him. *Mayes v. State*, 589 S.W.2d 637, 638 (Mo. App.1979). In the case at bar, defendant indicated to the trial judge his desire to have his wife and two sisters-in-law testify concerning his alibi defense, however, a statement by defendant's wife revealed she could not truthfully state defendant's whereabouts on the night of the murders. No showing appears concerning the sisters-in-law. In this regard defendant had made damaging admissions to the police concerning his connection with the crimes, and had counsel pursued the alibi defense, these prior admissions could have served as powerful weapons for the prosecution. In light of the strong evidence placing defendant at the scene, defendant's attorneys can hardly be faulted for their cogent advice against the pursuit of that defense. *Hughes v. State*, 507 S.W.2d 363, 365–66 (Mo.1974) (Seiler, J. concurring). The ineffective assistance of counsel claim fails.

### D.

Defendant finally complains of error by the trial court in refusing him permission to personally call and examine witnesses. However, the record discloses that defendant never requested, and, in fact, on two occasions refused to proceed pro se. Whether a defendant, represented by counsel, may participate in his own trial is a matter within the sound discretion of the trial court. *State v. Burgin*, 539 S.W.2d 652, 654 (Mo.App.1976). Further, as noted above, it is generally within the control of trial counsel to decide whether to proffer the testimony of defendant's alleged alibi witnesses. *State v. Banks*, 216 Kan. 390,

---

11. We note in passing that any ethical problems defense counsel perceived in promoting defendant's alleged alibi defense or any harm to defendant defense counsel foresaw resulting

from an aborted alibi claim would also have been encountered by substitute counsel. *State v. Banks*, 216 Kan. 390, 532 P.2d 1058, 1062 (1975).

532 P.2d 1058, 1061–63 (1975). In this framework and given defendant's apparent willingness manifested at the pretrial conferences to follow his attorneys' advice, we find no abuse of discretion on the part of the trial court in refusing to allow defendant to conduct his defense while represented by counsel.

Accordingly, the judgment is affirmed.

DONNELLY, C. J., and WELLIVER, MORGAN and HIGGINS, JJ., concur.

BARDGETT, J., dissents in separate dissenting opinion filed.

SEILER, J., dissents and concurs in separate dissenting opinion of BARDGETT, J.

BARDGETT, Judge, dissenting.

I respectfully dissent. I believe the principal opinion's construction of §§ 565.-001–.003, RSMo 1978, ignores their clear, unambiguous language.

Prior to September 28, 1975, the first-degree murder statute, § 559.010, RSMo 1969, included both "common form" first-degree murder and "felony" first-degree murder. After that date, "common form" first-degree murder was separated from "felony" first-degree murder and was designated "capital murder". Whether this change is viewed as creating one or two distinct new crimes or as merely separating two long-established types of murder, one fact is clear: capital murder is now a different crime than first-degree murder. No longer can proof of intent to commit a statutorily enumerated felony be equated to a premeditated and deliberate intent to kill as it could under the old first-degree murder statute. *See, e.g., State v. Jenkins,* 494 S.W.2d 14, 17 (Mo. 1973); *State v. Paxton,* 453 S.W.2d 923, 923–25 (Mo. 1970). Instead, capital murder and first-degree murder are separate crimes, requiring proof of different statutory elements for conviction.

Section 565.001 requires a person to have a mental state of an unlawful, willing, knowing, deliberate, and premeditated intent to kill when engaging in conduct that kills or causes the killing of another human being. Whereas § 565.003, first-degree "felony" murder, provides that for a person to be convicted he must unlawfully kill another human being in the perpetration or attempted perpetration of one of the enumerated felonies *without* the necessity of any premeditated intent to kill; that is to say that *now* the intent to commit the felony suffices to be convicted of first-degree murder.

Both crimes require conduct which results in another's death. First-degree murder, however, does not require any intent to kill; capital murder does. And the specific intent to kill required in capital murder must be formed in a cool and reflective state of mind. The requirement that these *two* elements ((a) intent to kill and (b) cool and reflective consideration of killing another) be found constitutes the difference between capital murder and all others, including first-degree murder which does not require even an intent to kill much less cool and reflective consideration of the homicide. This Court is not at liberty to disregard the distinction created by the legislature in defining the offenses. Deliberation and premeditation are not part of first-degree murder, but must be proved and that fact must be found by the jury to warrant conviction of capital murder.

The principal opinion, apparently recognizing the distinction between § 565.001 (capital murder) and § 565.003 (first-degree murder), upholds Turner's two capital murder convictions by attributing the requisite mental state of § 565.001 to him. The principal opinion gives inferences to the evidence from which it believes the jury could have found Turner actively participated in the robbery *and* killings. One victim's size, the distance between the two bodies, and the almost total lack of evidence of any struggle, the principal opinion asserts, could allow the jury to infer that Turner was a participant in the killings. Thus, it is said the jury could have found that Turner killed one of the victims with the intent to kill. But, intent to kill is not enough to support a capital murder conviction. Therefore, the principal opinion makes a

quantum leap to conclude that Turner, with premeditation and deliberation, killed and aided the killing of the *two* victims on the basis that the requisite mental elements may be proved by indirect and circumstantial evidence. The cases cited by the majority for this proposition, however, demonstrate that there is circumstantial evidence *and then there is circumstantial evidence.*

In *State v. Page,* 130 S.W.2d 520 (Mo. 1939), the defendant killed the victim—that was admitted. The evidence showed that there were ill feelings between them, and the defendant had no money, yet he knew the deceased had money and knew where it was hidden. While the deceased apparently was crawling over some bales of straw, the defendant shot him in the head and later retrieved the money. Clearly, the evidence allowed an inference that the defendant had planned to kill the victim so that he could get the money.

*State v. Williams,* 369 S.W.2d 408 (Mo. banc 1963), is similar to *Page.* In *Williams* the defendant raped and killed a girl. He had deposited a gun and ammunition in a field. He retrieved them when he saw a car with a boy and girl parked on the side of an isolated road. Defendant shot at the boy, reloaded the gun and shot again—killing him. Defendant told the girl to drive to a certain place and stop. She did. They got out of the car and defendant hit her several times with the gun and then carried her to a house. He dragged her across the porch into the house where he hit her again with the gun and then raped her. She later died. Undoubtedly, the circumstances evidenced a basis for finding that the defendant premeditatedly and deliberately killed the girl.

In *State v. Mitchell,* 408 S.W.2d 39 (Mo. 1966), it also was clear that defendant *was* the one who killed the victim. He contended that he had done so in the heat of passion. The evidence, however, showed that the defendant and the victim after a fight had exchanged hats, shaken hands, and made up. The defendant then left. He returned after several minutes and fired a shot. He left and a few minutes later

returned again. This time he shot and killed the victim. No doubt he had time to reflect on his act and with a cool and deliberate state of mind he killed the deceased.

*State v. Lindsey,* 507 S.W.2d 1 (Mo. banc 1974), is the only case in which there was evidence that defendant did not commit the murder himself. The defendant and an accomplice made plans to steal property. Before carrying out the plan, defendant's partner got a baseball bat because, as he said, "I'm going to kill someone tonight." *Id.* at 2. The partner assured defendant he was going to use the bat and defendant agreed to continue in the stealing, knowing his partner intended to use the bat and intended to kill someone with it. On the way to the place they were going to rob, the partner broke several windows, demonstrating what he was going to do to the victims. This Court held:

> The continuation of appellant in the plan to rob *after Maxie* obtained the ball bat and *announced his intention to kill someone with it,* clearly authorized a finding by the jury of the requisite deliberation and premeditation on the part of appellant to participate in a killing. The submission of deliberation in Instruction No. 2 was supported by the evidence.

*Id.* at 4 (emphasis added).

The instant case is dissimilar to the ones cited. Although Turner's participation in the robbery was shown by direct evidence (his confession), his participation in the killings was shown, if at all, only by circumstantial evidence. There was no direct evidence that Turner killed anyone—no evidence that Turner formed an intent to kill someone—no evidence that Turner coolly and deliberately intended to kill. There was not even any evidence that *Mitchell* wanted to kill someone or intended that his cofelon kill anyone. In fact, if it was the blow to the head of Neeley that evidenced an intent to do great bodily harm or kill, in the view of the principal opinion, then that very evidence militates against "cool and deliberate reflection" on killing another. It appears to have been an action based on reflex rather than reflection. The principal

opinion has shaded out of our law the element of deliberation and it becomes virtually meaningless in homicides committed during the course of a designated felony.

The prosecutor argued to the jury that acts of Mitchell were acts of Turner and Mitchell's intent was Turner's. For a conviction of capital murder, such a statement is only partially true. Capital murder requires a personal and individual mental state for a person who kills or causes the death of another human being. Turner had to promote the killings and have both the intent to promote them *and* the requisite intent for capital murder in order to be guilty of capital murder. The only element of capital murder which can be attributed to one not the perpetrator is the conduct—the act of killing;[1] the intent to kill and the deliberation on it cannot be imputed. Any suggestion by the state or the principal opinion to the contrary is incorrect. Otherwise, if the specific mental state of the perpetrator can be given to the accessory, there is no need for first-degree murder in which, the legislature has directed, one can be found guilty of murder without any intent to kill. Instead, the state could prove the elements of one crime (felony murder) and attach to it the punishments authorized for the higher offense—death penalty and life imprisonment without probation or parole for fifty years. Clearly, such a situation is in contravention of legislative mandates. But perhaps equally as clear, the principal opinion has implicitly endorsed such a result.

Accepting the principal opinion's inferences as true, the jury could conclude that both Mitchell and Turner were inside the store and that Turner killed *one* of the victims. At best, this would allow an inference of intent to kill, but not premeditation and deliberation. The record is devoid of any evidence that Turner might have thought about killing the victim with a cool and deliberate state of mind. The majority contends, however, that if Turner killed one of the victims, proved by circumstantial evidence, then there is circumstantial evidence that he shared Mitchell's intent, *i.e.*, to leave no witnesses. In so concluding, the principal opinion creates a conduit through which the intent to commit a felony enumerated in § 565.003 is transferred to § 565.001 and becomes a premeditated and deliberate intent to kill. Under the majority's theory, whenever a victim is killed during the commission of a § 565.003 felony, all the participants could be convicted of capital murder. For instance, during the course of robbing a liquor store, one of the robbers kills an employee. The other participant knows his partner is carrying a loaded gun. Whether it is expressed as a premeditated and deliberate intent to kill or as an intent to leave no witnesses, there is circumstantial evidence that the second felon had the same intent as the one who pulled the trigger, to complete the robbery successfully and not be caught.

The principal opinion by not demanding a qualitative difference in proof between capital murder and first-degree murder is implicitly allowing convictions of all cofelons when a murder is committed during the course of arson, rape, robbery, burglary, or kidnapping of capital murder. Thus, in all felony-murder cases the state can charge all participants with capital murder. If the jury returns a guilty verdict, this Court will

---

1. The case on which most Missouri courts have relied in expressing the criminal liability of an accessory provided:

> If two or more persons agree together to commit some crime, and enter upon the commission of the crime, and one of them, in pursuance of the common design and for the purpose of carrying it out, performs some criminal act different from that in contemplation of the parties at the outset, the others will be guilty of the *criminal act.*

*State v. Plotner*, 283 Mo. 83, 96, 222 S.W. 767, 772 (1920) (emphasis added). Of course, the requisite mental state must still be proved. In most instances, when a participant intends to promote the commission of a crime he has the requisite mental state mandated by the statute. When a different crime is committed than was contemplated, however, the necessity of requiring the two mental states to be found becomes crucial. For a review of the necessary mental state required to convict an accessory, see *State v. White*, 622 S.W.2d 939, 948 (Mo. banc 1981) (Seiler, J., dissenting).

uphold the conviction. Except in the most extreme cases, whenever the evidence can be said to prove that the murderer had a premeditated and deliberate intent to kill, circumstances will exist by which it can be inferred that all cofelons shared the same intent, *i.e.*, to leave no witnesses. Consequently, the principal opinion obliterates almost all distinctions created by the legislature between capital murder and felony murder, and we are left with the situation existing before September 28, 1975, when the two forms of murder were contained in the same statute. In order to avoid this situation and the more severe penalties, a defendant is forced to prove his innocence of capital murder—a condition hardly consonant with the precepts of our system of justice. Still, in the instant case this is what Turner attempted to do.

Turner wanted to call Michael Cooper as a witness. Cooper would have testified that on several occasions *Mitchell* admitted "wasting the two dudes". The state, which had used the testimony in Mitchell's trial, successfully blocked its introduction. When all the circumstances are considered, however, I believe Cooper should have been allowed to so testify.

*Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), cited in the principal opinion, bears a striking similarity to the instant case. In *Chambers* the defendant was ᴏn trial for the murder of a policeman. His defense was that he did not commit the crime and another man, McDonald, had. Apparently McDonald had told three people that he killed the policeman and also had signed a confession. Defendant called McDonald as a witness and got into evidence McDonald's signed confession of the murder. The state did cross-examine him, but only for the purpose of rehabilitating the witness by allowing him to give his reasons for lying when he made the confession. Thus, McDonald denied killing the policeman and was rendered unavailable to the defendant. Even if the trial court had permitted defendant to examine McDonald as an adverse witness, undoubtedly he still would have denied his involvement in the killing.

Similarly, Mitchell also denied he killed the two people in the liquor store at his trial. In Turner's trial, Mitchell took the fifth amendment, refusing to admit that he even was Johnny Mitchell. In both *Chambers* and the instant case, the declarants admit no complicity in any murder. Thus, in both cases the declarants' out-of-court statements become crucial to the defendants. In *Chambers* the defendant tried to get into evidence the statements of three people to whom McDonald had admitted killing the policeman. Turner also attempted to call a witness to whom Mitchell admitted several times he had killed the "two dudes". In both cases the testimony was refused as hearsay. In *Chambers*, however, the United States Supreme Court reversed the Mississippi Supreme Court and held that each confession was made spontaneously to a close acquaintance shortly after the murder occurred; whatever the parameters of the penal-interest rationale, each confession was self-incriminatory and clearly against interest; and corroborating evidence to ensure the trustworthiness of the declarations was available. Thus, even though the statements were hearsay, the circumstances provided considerable assurance of their reliability and to exclude the statements deprived defendant of a fair trial.

The United States Supreme Court arrived at the same conclusion in *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979) (per curiam). At the punishment phase of his capital murder trial, the defendant attempted to prove that he had not killed the victim. He wanted to introduce testimony of a witness to whom Moore, Green's accomplice in the underlying felonies, had admitted killing the victim. The Supreme Court found:

Regardless of whether the proffered testimony comes within Georgia's hearsay rule, under the facts of this case its exclusion constituted a violation of the Due Process Clause of the Fourteenth Amendment. The excluded testimony was highly relevant to a critical issue in the pun-

ishment phase of the trial . . ., and substantial reasons existed to assume its reliability. Moore made his statement spontaneously to a close friend. The evidence corroborating the confession was ample, and indeed sufficient to procure a conviction of Moore and a capital sentence. The statement was against interest, and there was no reason to believe that Moore had any ulterior motive in making it. *Perhaps most important, the State considered the testimony sufficiently reliable to use it against Moore, and to base a sentence of death upon it.* In these unique circumstances, "the hearsay rule may not be applied mechanistically to defeat the ends of justice."

*Id.* at 97, 99 S.Ct. at 2151 (emphasis added) (citations omitted) (footnote omitted). Whether this evidence was introduced at the punishment or guilt phase of the trial made no difference. The Georgia Supreme Court distinguished *Chambers* from Green's case on the basis that in *Chambers* the out-of-court statements were attempted to be introduced at the guilt or innocence portion of the trial and Green wanted to introduce the out-of-court statements of his accomplice at the punishment phase of the trial. In addition, the Georgia court found that the testimony in *Chambers* would have totally exonerated Chambers, and at Green's trial the evidence would not have exonerated him of the underlying felonies. *Green v. State*, 242 Ga. 261, 271, 249 S.E.2d 1, 9 (1978). Obviously, the United States Supreme Court rejected such distinctions citing *Chambers v. Mississippi, supra,* and held that under *Chambers* such testimony should have been admitted. Thus, *Green* is not distinguishable from the instant case merely because Turner wanted to introduce the testimony during the guilt or innocence phase of the bifurcated trial and the testimony would not have totally exonerated him. Both Green and Turner attempted to prove the *same* fact which was the critical issue at trial: they killed no one. Furthermore, the confession of Mitchell to Cooper in the instant case bore the same assurances of reliability as existed in *Green* and *Chambers*.

The statements were made to or overheard by a close acquaintance, Cooper, shortly after the murders. Each confession was in a very real sense self-incriminatory and unquestionably against interest. The *total* circumstances indicated that the declarations were reliable. Mitchell had tried to get Cooper to help him in robbing the High Pockets Liquor Store and later confessed to Cooper that he had robbed it. *But more importantly, what separates this case from ones cited by the principal opinion and brings it within the holding of Green is that precisely the same evidence Turner wanted to introduce was the most powerful evidence used by the state to convict the declarant.* The same plaintiff—State of Missouri—almost totally relied on Cooper's testimony as to what Mitchell said to prove Mitchell killed *both* victims. One could hardly find an expression of reliability more convincing than that.

The state called Cooper to testify in Mitchell's trial, wanting the jury to believe his testimony and fully expecting it to do so. The state presented him as the last witness and he was the *only* person who linked Mitchell *directly* with the killings. Cooper contended that at *two* separate times Mitchell said he killed the two men. The state carefully questioned Cooper to make it clear that Mitchell, not Turner, was the one who admitted killing two men. When Mitchell took the stand in his own trial, the state, contrary to what the principal opinion asserts, had the means of testing the truthfulness of his statements and on cross-examination attempted to do so. The state *had* the opportunity to cross-examine the declarant and *did* cross-examine him. The state should not now be allowed to complain that it had no opportunity to cross-examine Mitchell in Turner's trial. Actually, Turner is the one who had *no* opportunity to do so in any trial. On the basis of this hearsay, at least in part, Mitchell was convicted on two counts of capital murder.

Of course, the state did not want Cooper to testify at Turner's trial because "the testimony was hearsay". Even though

hearsay, because of the unique circumstances of this case, it should have been admitted and indeed, the traditional and fundamental standards of due process required it to be. The testimony rejected bore persuasive assurances of trustworthiness—the confession was made twice to a close acquaintance; it was definitely against interest; *and it was submitted by the state in a previous trial as true and the declarant was cross-examined by the state in that trial.* Further, this testimony was even more critical to Turner's defense than was the testimony to the defendant in *Chambers.* In *Chambers* the defendant presented evidence that contradicted McDonald's alibi and showed McDonald owned a .22 pistol (the policeman was killed by four .22-caliber bullets). In addition, Chambers introduced the testimony of two witnesses to the killing—one saw McDonald with a gun in his hand and the other saw McDonald shoot the policeman. Certainly, if the rejected testimony in *Chambers* was, as the Supreme Court described, critical, then it is even more so in the instant case. Here, the only evidence that Turner did not participate in the killings was from Turner himself. Cooper's testimony would have corroborated Turner's story that he did not kill either victim and was not even in the store when the fatal wounds were inflicted. The Supreme Court in *Chambers* never required that the hearsay *totally exonerate* a defendant before the principles enunciated there could be applied, as the principal opinion asserts

and as the Georgia Supreme Court asserted in *Green v. State, supra.* The United States Supreme Court in *Green v. Georgia, supra,* held the out-of-court statements had to be admitted, even though they would not have totally exonerated the defendant. The Court did state however, in *Chambers* that "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." 410 U.S. at 302, 93 S.Ct. at 1049. Here, the application of that proposition is evident; Turner was seeking exoneration from capital murder.

The state sought his conviction on two counts of capital murder with a punishment of death. A conviction of first-degree murder with the attendant penalty of life imprisonment is a significantly less severe punishment. Although Turner received life imprisonment without the possibility of probation or parole for fifty years on each count and not the death penalty, a flat life sentence still would have been less severe. There was evidence which would have supported a conviction of first-degree murder. The state tacitly admits it,[2] Turner admits it,[3] and the trial judge admits it.[4] Even so, Cooper's testimony still was critical to Turner's defense. If the jury had had the benefit of the testimony, it would have made more credible Turner's version of the robbery and more likely that the jury would have found defendant guilty of first-degree murder, rather than capital murder.

2. The state argues in its brief:

> [I]f two or more persons join in a purpose to commit a crime, each of them, if actually or constructively present, is not only guilty as a principal if the other commits that particular crime, but he is also guilty of any other crime committed by the other in pursuance of the common purpose, or as a natural or probable consequence. . . . By appellant's own statement he indicates that the victims were killed so that no witnesses would be left behind. Therefore, respondent contends that the killing was in pursuance of the common purpose, i. e., the successful perpetration of the robbery. Further, respondent contends that a killing is a natural and probable consequence of a robbery perpetrated by use of a gun.
>
> Respondent's brief at 28 (citation omitted).

> Although the state later argues that the jury could have inferred from the evidence that Turner formed the requisite mental state for capital murder, the quoted portion of the brief would only support a conviction of first-degree murder, especially since Turner only repeated that Mitchell said he killed the victims to leave no witnesses.

3. Appellant's brief at 49.

4. In a "letter" to the appellate court reviewing the case, the trial judge commented, "[I]f you have waded through this whole trial you'll see that felony murder is probably what we're talking about here . . . . I think there are all of the elements for felony murder in this case. I think that it is very possible that's what the evidence supports." Transcript at 616, 617–18.

According to Turner, he and Mitchell went to the liquor store and bought a beer. After leaving the store, Mitchell told Turner to drive the truck around the block, park it, and then walk back to the store. Turner apparently knowing Mitchell was going to rob the store, did as he was directed. When Turner entered the business, he saw a man, Mr. Neeley, struggling to get to his feet. Although Turner struck him on the head with a beer bottle, the evidence showed that it did not kill Neeley or contribute to his death. According to Turner, he never saw Parker and apparently did not know that Parker, who was probably dead at the time, was lying behind the counter. Admittedly, Turner could be convicted of first-degree murder for the death of Neeley and Parker committed by his cofelon during the course of a robbery in which Turner intended to and did participate. But, clearly no evidence exists from which it might be even remotely inferred that Turner formed a wilful, deliberate, and premeditated intent to kill both Parker and Neeley.

Under the unusual circumstances and facts of this case, I believe that Cooper should have been allowed to testify. "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi, supra,* 410 U.S. at 302, 93 S.Ct. at 1049. The Supreme Court in *Chambers* held that refusal to permit introduction of the witnesses's testimony was a violation of due process because it deprived the defendant of a fundamentally fair trial. The same is true in Turner's case. And, as indicated, the state can hardly claim the statement by Mitchell that he killed both men lacks credibility when the state substantially relied on that very statement to convict Mitchell of both murders. Nor does the fact that the state could not cross-examine Mitchell in Turner's trial deprive the state of any substantial right. The state surely would not undertake now to prove Mitchell did *not* make that statement after convicting him on the premise that he did claim the two killings. Therefore, I believe it was error to have sustained the state's objection to the admission of Cooper's statement into evidence.

It seems clear that appellant is guilty of two first-degree murders due to his participation in the robbery, or at least the evidence would support such a verdict. The general assembly has made a definite distinction between capital murder and first-degree murder and we should recognize that distinction in the practical application of these statutes under the evidentiary situations in the various cases. Here, there is no evidence that appellant killed Parker or agreed to kill Parker or Neeley. Further, the evidence is that the blow to Neeley's head by appellant neither killed him nor contributed to his death.

As to this appellant, we have a classic case of first-degree murder under § 565.003 and no substantial evidence from which it could reasonably be found that this defendant (a) killed Parker or Neeley, (b) intended to kill Parker or Neeley, or (c) that this defendant considered taking the life of Neeley or Parker and reflected on that matter coolly and fully before they were killed.

The convictions of capital murder should be reversed and the case remanded for new trial. I therefore dissent.